# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### February 1, 2006 Session

## STATE OF TENNESSEE v. BRUCE WARREN SCARBOROUGH

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 75589    Mary Beth Leibowitz, Judge**

**No. E2004-01332-SC-R11-CD - Filed on August 28, 2006**

AND

## STATE OF TENNESSEE v. MACK T. TRANSOU

**Appeal by permission from the Court of Criminal Appeals**
**Circuit Court for Madison County**
**Nos. 02-359, 02-360    Roy B. Morgan, Jr., Judge**

**Nos.  W2004-01475-SC-R11-CD, W2003-02966-SC-R11-CD - Filed on August 28, 2006**

We granted these appeals to determine whether the extraction of blood from a convicted and incarcerated felon for DNA analysis pursuant to Tennessee's DNA collection statute, Tenn. Code Ann. § 40-35-321 (2003), is constitutional under both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution.  These three cases come before us upon Defendant Scarborough's interlocutory appeal from the denial of his motion to suppress evidence and upon Defendant Transou's direct appeals from his convictions in two separate cases. Transou also challenges the sufficiency of the evidence supporting his convictions of rape and aggravated burglary in one of his cases and the sentences he received for those offenses.  We conclude that the DNA collection statute is constitutional as applied here.  We further hold that Transou consented to having his blood drawn; that the evidence is sufficient to support Transou's convictions of  rape and aggravated burglary; and that his sentences for those crimes are valid. The judgments of the Court of Criminal Appeals in all three cases are affirmed.

**Tenn. R. App. 9; Tenn. R. App. 11; Judgments of the Court of Criminal Appeals Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., AND JANICE M. HOLDER, JJ., joined.

Mark E. Stephens, District Public Defender, and John Halstead, Assistant Public Defender, Knoxville, Tennessee, for the Appellant, Bruce Warren Scarborough.

Mike Mosier (at trial on No. 02-359) and Richard L. Finney (at trial on No. 02-360 and on appeal in both cases), Jackson, Tennessee, attorneys for the Appellant, Mack T. Transou.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Brent C. Cherry, Assistant Attorney General; Randall E. Nichols, District Attorney General, and Kevin Allen, Assistant District Attorney (Scarborough); Jerry Woodall, District Attorney General, and Jody S. Pickens, Assistant District Attorney General (Transou), attorneys for the Appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

### Introduction

The appeals in these three cases were consolidated for oral argument because they involve related questions of law involving Tennessee Code Annotated section 40-35-321 (2003) ("the DNA collection statute") which provides:

> (d)(1) When a court sentences a person convicted of any felony offense committed on or after July 1, 1998, it shall order the person to provide a biological specimen for the purpose of DNA analysis as defined in subsection (a). If the person is not incarcerated at the time of sentencing, the order shall require the person to report to the county or district health department, which shall gather the specimen. If the person is incarcerated at the time of sentencing, the order shall require the chief administrative officer of the institution of incarceration to designate a qualified person to gather the specimen. The biological specimen shall be forwarded by the approved agency or entity collecting such specimen to the Tennessee bureau of investigation which shall maintain it as provided in § 38-6-113. The court shall make the providing of such a specimen a condition of probation or community correction if either is granted.

We begin by reviewing briefly the background of each case.

**Defendant Scarborough**

On March 10, 1999, defendant Bruce Warren Scarborough pleaded guilty in Blount County to committing aggravated burglary, theft, and sexual battery on August 25, 1998. Aggravated burglary and sexual battery are Class C and E felonies, respectively. See id. §§ 39-14-403(b), 39-13-505(c). Scarborough was incarcerated for his crimes and, on April 22, 1999, participated in the prison facility's health screening for new inmates. During this screening, he was requested to submit a blood specimen pursuant to the DNA collection statute for DNA analysis, defined as "the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes." Id. § 40-35-321(a). Scarborough signed a consent form for the blood draw and DNA analysis, and a blood specimen was obtained. A DNA analysis was performed, and the results were submitted to the Federal Bureau of Investigation's Combined DNA Index System (CODIS).

In June 2002 the Tennessee Bureau of Investigation reported that the DNA profile obtained from the 1999 specimen submitted by Scarborough matched the DNA profile obtained from a sample of forensic evidence recovered during a physical examination conducted on J. S., a woman who reported that she had been raped in Knox County on March 2, 1997.[1] Following this match, a search warrant was obtained on July 8, 2002, and a second specimen of blood was taken from Scarborough. Analysis of the second specimen confirmed that Scarborough was the source of the forensic evidence obtained during the examination of the 1997 rape victim. Scarborough was subsequently charged with four counts of aggravated rape against J. S. That case is before us today.

Scarborough filed a motion to suppress the evidence obtained as a result of the blood specimen drawn in 1999 pursuant to the DNA collection statute, asserting that the DNA collection statute is unconstitutional because it violates his federal and state constitutional rights against unreasonable searches and seizures. The trial court denied the motion on its merits but granted an interlocutory appeal. The Court of Criminal Appeals accepted the interlocutory appeal and affirmed the judgment of the trial court. Scarborough then sought this Court's review, which we granted.[2]

---

[1]This Court identifies the victims of sexual offenses by their initials.

[2]Interlocutory appeals to review pretrial orders or rulings are generally "disfavored," especially in criminal cases. State v. Gilley, 173 S.W.3d 1, 5 (Tenn. 2005). In Scarborough's case, the trial court noted that the suppression issue is dispositive in one of four other cases pending against him and would further assist the trial court in determining whether evidence against him in the three other cases should be suppressed. Further, the constitutionality of the DNA collection statute is a matter of first impression before this Court. Interlocutory appeals are appropriate where there is a need to prevent needless, expensive, and protracted litigation and a need to develop a uniform body of law. See Tenn. R. App. P. 9(a) (2), (3). We therefore conclude that an interlocutory appeal of the denial of Scarborough's motion to suppress is proper.

**Defendant Transou**

Defendant Mack Transou was convicted in 1999 of the Class E felony offense of driving after being declared a motor vehicle habitual offender. See id. §§ 55-10-613(a), 55-10-616(b). The offense date was May 14, 1997. Transou was subsequently incarcerated for his infraction. During intake processing at the prison, Transou signed a consent form and submitted to a blood draw. A DNA analysis was performed and the results were submitted to CODIS. Transou's DNA profile was eventually matched to profiles developed from forensic evidence obtained in two unsolved crimes: the reported rape of S. K. in December 2001 and the reported rape of C. T. in March 2002. Transou was subsequently charged with both sets of offenses. In both cases he filed a motion to suppress the evidence obtained pursuant to the 1999 blood draw taken while he was in prison.[3] The motions were consolidated in the trial court for a single hearing on January 9, 2003.

At the suppression hearing, Teresa Patterson, a licensed practical nurse, testified that she had been employed by the Department of Correction to draw blood samples from inmates. She explained the procedure:

> The first thing we would do as they entered intake would be explain the procedure to all the inmates because there was a consent form to sign. After the inmates sign the consent form, they would be brought into the lab room where the blood would be drawn, labeled at the same exact time, packaged at the exact same time and then sealed.

Ms. Patterson identified a consent form bearing her signature dated September 7, 1999. This form also bears Transou's name at the location indicating consent to a blood draw. Ms. Patterson stated that inmates would occasionally object to having their blood drawn and that there was an administrative procedure in place to address those objections.

The consent form dated September 7, 1999, and bearing Transou's name was admitted into evidence. It is titled "Consent for DNA Analysis" and provides, in pertinent part, as follows:

> I, Mack Transou, understand that I am being requested to allow the health professional to collect a blood specimen as required in statute TCA §40-35-321, collection of biological specimens for DNA analysis - persons convicted of certain offenses - condition of release from imprisonment.
>
> TCA §40-35-321 provides that any person convicted of violating or attempting to violate §39-13-502 (Aggravated Rape), § 39-13-503 (Rape), §39-13-

---

[3]In May 2002, after Transou had been released from prison, he was taken into custody for questioning because his DNA profile, developed from the 1999 blood draw and submitted to CODIS, had been matched to evidence obtained during S. K.'s rape-kit examination. On May 16, 2002, Transou submitted another blood draw to Lieutenant Mike Holt. This "known sample" was then matched to forensic evidence in both the S. K. and C. T. rape cases. Transou contested the validity of this May 2002 search in the courts below but does not contest it before this Court.

-4-

504 (Aggravated Sexual Battery), §39-15-505 (Sexual Battery), §39-13-522 (Rape of a Child), or §39-15-302 (Incest), must provide a biological specimen for the purpose of DNA analysis. Furthermore, TCA §40-35-321 provides that any person convicted of any felony offense committed on or after July 1, 1998, must provide a biological specimen for the purpose of DNA analysis. The biological specimen will be forwarded to the Tennessee Bureau of Investigation which shall maintain it as provided in §39-6-113.

If a person convicted of violating or attempting to violate §39-13-502, §39-13-503, §39-13-504, §39-13-505, §39-13-522, §39-15-302, or §40-35-321 [sic], and committed to the custody of the commissioner of correction for a term of imprisonment, does not provide a biological specimen for the purpose of DNA analysis before completion of the person's term of imprisonment, that person may not be released on parole or otherwise unless and until such person provides such a specimen.

If an inmate is convicted of a disciplinary offense for refusing to provide a biological specimen, he/she shall forfeit the opportunity to earn behavior sentence credits until such time he/she provides a biological specimen. If applicable, previously earned behavior sentence credits shall not be forfeited. A person refusing to provide a biological specimen may at a later date provide a specimen. For those persons refusing to provide a specimen, a due process hearing shall be provided by the disciplinary board.

The consent form contains two alternative signature lines for the inmate: one following the statement "By signing this I acknowledge that I understand the above mentioned" and the other following the statement "I am refusing to participate in the DNA testing process." Transou's signature appears on the first of these lines.

Transou testified at the suppression hearing about the circumstances surrounding the blood draw:

You know, we was kind of in a rush when we went through there. They just told everybody just go through these forms here and fill them out and sign them. You know, I didn't even take time to read, you know, what I was signing. You just went through there. They had something like six forms. We went through them and signed them, and they S they drew the blood.

Concerning his knowledge about participation in DNA testing, Transou also testified, "Technically it was not required when I went through. They just started this back in 2000."

On cross-examination, Transou admitted he had been "in and out of jail" most of his adult life. Consequently, he was "very well familiar" with the criminal justice system. He was familiar

with the law library at the prison and had done research there, even filing motions on his own behalf. Transou identified his signature on two motions he had filed with the court, and on a letter he had sent the court. He acknowledged the importance of reading documents before signing them. He acknowledged previous familiarity with the Consent for DNA Analysis form. He acknowledged having signed the September 1999 Consent for DNA Analysis form, but contended that he did so in order to avoid a disciplinary action.

On redirect, Transou maintained that he "wasn't given a choice" about whether to submit to the blood draw.

Connie Howard testified that she is the state administrator for CODIS. She explained that CODIS is a local, state, and national database for DNA profiles developed from forensic evidence collected in criminal investigations and from "convicted offender samples." According to Ms. Howard, a sample from Transou collected on September 7, 1999, was submitted to CODIS.

The trial court denied Transou's motion to suppress, ruling that at the time he signed the consent form Transou knew the DNA collection statute did not apply to him, and that "when considering [Transou's] educational level, his familiarity with the criminal justice system, and his acknowledgment that he was familiar with the consent form he signed on 9/7/99, [Transou] intelligently, knowingly, and voluntarily consented to having his blood drawn."

Following the denial of his motions to suppress in both cases, Transou was tried before a jury in each one. In the case involving victim C. T., Transou was convicted of one count of rape and one count of sexual battery. In the case involving victim S. K., Transou was convicted of one count of rape and one count of aggravated burglary. Because Transou contests the sufficiency of the evidence supporting his convictions for the offenses committed against S. K.,[4] we set forth the Court of Criminal Appeals' summary of the proof adduced at his trial for these offenses:[5]

> In the early hours of the morning on December 23, 2001, the victim, [S. K.], awoke to the sound of [Transou] crashing through her bedroom door. [Transou] grabbed her and though the victim fought to push him away, he succeeded in raping her. When the police arrived, they found the victim visibly upset and extremely frightened. Although the victim identified [Transou] at trial, on the morning of the assault she was only able to give investigators a general description of her assailant, including his general age, height, weight, race, and clothing. Police determined that [Transou] had broken in and fled through the victim's back door, as evidenced by the broken glass, cut screen, and damage to the door itself. Investigators were not able to collect any usable fingerprints from the victim's home. The victim was taken to

---

[4]Transou does not contest the sufficiency of the evidence supporting his convictions for the offenses committed against C. T.

[5]Transou concedes in his application for permission to appeal to this Court that the Court of Criminal Appeals' statement of facts is "substantially correct."

the emergency room, where physicians performed an examination and sexual assault kit. An examination of the sexual assault kit revealed the presence of semen. DNA from semen collected as part of the sexual assault kit was compared with DNA from a sample of [Transou's] blood, and they matched. According to the crime lab technician who testified at trial, the probability that another person besides [Transou] would have the exact DNA profile is one out of a number so large that it exceeds the current world population. Specifically, the crime lab technician testified that, based on the statistics, no person other than [Transou] could have been the source of the semen collected during the physical examination of the victim.

Based on this proof the jury convicted Transou of one count of rape of S. K. and one count of aggravated burglary. The trial court subsequently sentenced Transou to concurrent terms of sixteen years and fifteen years of incarceration, respectively.

## ANALYSIS

### I. Standard of Review

We will uphold a trial court's findings of fact in a hearing on a motion to suppress evidence unless the evidence preponderates otherwise. State v. Cox, 171 S.W.3d 174, 178 (Tenn. 2005). Questions regarding witness credibility, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000). The prevailing party is afforded the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn therefrom. Id. However, this Court reviews de novo the trial court's application of the law to the facts without according any presumption of correctness to those conclusions. Id.

### II. DNA Collection Statute

In 1994 the United States Congress empowered the Federal Bureau of Investigation to create a database of DNA profiles, see 42 U.S.C.A. § 14132 (1995), commonly referred to as the Combined DNA Index System (CODIS). In response, all fifty states enacted legislation to collect biological specimens for the purpose of creating a DNA profile of persons convicted of certain crimes, see United States v. Kincade, 379 F.3d 813, 848 (9th Cir. 2004) (en banc) (Reinhardt, J., dissenting), and placed those DNA profiles in the searchable CODIS database. See Federal Bureau of Investigation, NDIS Participants, *available at* http://www.fbi/gov/hq/lab/codis/partstates.htm.

Tennessee Code Annotated section 40-35-321 sets forth the circumstances in Tennessee under which a convicted felon will be required to submit a biological specimen for DNA analysis. Subsection (b) provides that a court sentencing a person convicted of committing or attempting to commit aggravated rape, rape, aggravated sexual battery, sexual battery, rape of a child, or incest, "shall order the person to provide a biological specimen for the purpose of DNA analysis." Tenn. Code Ann. § 40-35-321(b). Furthermore, persons convicted of *any* felony committed on or after July

1, 1998, are to be ordered by the trial court upon sentencing to submit a biological specimen for DNA analysis.  Id. at (d)(1).  These biological specimens are to be forwarded to the Tennessee Bureau of Investigation "which shall maintain [them] as provided in § 38-6-113."[6]  Id. at (b), (c), (d). Scarborough's blood was drawn, and his DNA profile developed, pursuant to these statutory provisions.

### III.  DNA Collection as Search

The State contends that the collection of Scarborough's blood for DNA analysis and identification purposes does not constitute a search under the Fourth Amendment to the United States Constitution.[7]  We disagree.  The United States Supreme Court recognized in Skinner v. Ry. Labor Executives' Assn. that the physical intrusion occasioned by a blood draw "infringes an expectation of privacy."  489 U.S. 602, 616 (1989); see also State v. Blackwood, 713 S.W.2d 677, 679 (Tenn. Crim. App. 1986) (recognizing that the withdrawal of blood for testing is subject to the constraints of the Fourth Amendment).  Moreover, "[t]he ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested [individual's] privacy interests." Skinner, 489 U.S. at 616.  Scarborough's blood draw and its subsequent analysis are both subject to the constitutional limitations imposed by the Fourth Amendment.

---

[6]Tennessee Code Annotated section 38-6-113 (2003) provides:

> (a)  As used in this section, unless the context otherwise requires, "DNA analysis" means the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes.
> (b)  The Tennessee bureau of investigation shall develop uniform procedures for the collection and preservation of human biological specimens for DNA analysis in cases of alleged or suspected violations of § 39-13-502, § 39-13-503, § 39-13-504, § 39-13-505, § 39-13-522 or § 39-15-302.  Law enforcement agencies and medical personnel who conduct evidentiary examinations shall use the uniform procedures in their investigation of the above offenses.
> (c)  The bureau shall adopt uniform procedures to maintain, preserve and analyze human biological specimens for DNA.  The bureau shall establish a centralized system to cross-reference data obtained from DNA analysis.
> (d)  The bureau shall perform DNA analysis and make data obtained available to law enforcement officials in connection with appropriate criminal investigations in which human biological specimens have been recovered.  The bureau shall also make the data available to the district attorney general, and the subject of the data in any subsequent criminal prosecution of the subject.

[7]The Fourth Amendment is applicable to the State of Tennessee pursuant to the Fourteenth Amendment of the United States Constitution.  Mapp v. Ohio, 367 U.S. 643, 655 (1961).

## IV. The Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. Thus, the Fourth Amendment permits *reasonable* searches. See Skinner, 489 U.S. at 619 ("[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable."); Florida v. Jimeno, 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness."). By its own terms, the Fourth Amendment deems reasonable those searches conducted pursuant to a warrant issued "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Under certain circumstances, searches conducted without a warrant but pursuant to individualized suspicion of criminal wrongdoing are also considered reasonable. See, e.g., Terry v. Ohio, 392 U.S. 1, 24-27 (1968) (upholding "stop and frisk" searches upon reasonable suspicion as a general exception to the warrant requirement); Chimel v. California, 395 U.S. 752, 762-63 (1969) (upholding searches conducted incident to arrest as a general exception to the warrant requirement). Searches pursuant to the DNA collection statute are undertaken, however, with neither a warrant nor any individualized suspicion. Thus, we must look for another basis upon which to analyze the reasonableness of these searches.

The United States Supreme Court has emphasized "the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989); see also Skinner, 489 U.S. at 624 (recognizing that "a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable"); Illinois v. Lidster, 540 U.S. 419, 424 (2004) (acknowledging that "special law enforcement concerns will sometimes justify [seizures] without individualized suspicion"). Rather, "where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." Skinner, 489 U.S. at 624.

DNA collection done automatically upon incarceration is by definition performed without any individualized suspicion that the inmate has committed a specific crime. Yet all fifty states and the federal government have enacted some type of DNA collection statute requiring some or all convicted felons to submit a biological sample for DNA profile analysis and storage in a DNA data bank. See State v. Raines, 857 A.2d 19, 23 (Md. 2004) (citing 42 U.S.C. §§ 14131-34 and Michelle Hibbert, *DNA Databanks: Law Enforcement's Greatest Surveillance Tool?*, 34 Wake Forest L. Rev. 767, 771 n.12 (1999)). Although the United States Supreme Court has yet to opine on this issue, to date, all Fourth Amendment challenges to these regimes have been ultimately unsuccessful. See, e.g., United States v. Conley, 453 F.3d 674, 680-81 (6th Cir. 2006); United States v. Kraklio, 451 F.3d 922, 924-25 (8th Cir. 2006); Nicholas v. Goord, 430 F.3d 652, 655 (2d Cir. 2005); United States v. Sczubelek, 402 F.3d 175, 177 (3d Cir. 2005); Padgett v. Donald, 401 F.3d 1273, 1275 (11th Cir. 2005); Kincade, 379 F.3d at 832; Green v. Berge, 354 F.3d 675, 679 (7th Cir. 2004); Groceman

v. United States Dep't of Justice, 354 F.3d 411, 413-14 (5th Cir. 2004) (per curiam); United States v. Kimler, 335 F.3d 1132, 1146 (10th Cir. 2003); Velasquez v. Woods, 329 F.3d 420, 421 (5th Cir. 2003) (per curiam); Roe v. Marcotte, 193 F.3d 72, 79-82 (2d Cir. 1999); Shaffer v. Saffle, 148 F.3d 1180, 1181 (10th Cir. 1998); Schlicher v. Peters, 103 F.3d 940, 943 (10th Cir. 1996); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1996); Rise v. Oregon, 59 F.3d 1556, 1562 (9th Cir. 1995); Jones v. Murray, 962 F.2d 302, 308 (4th Cir. 1992); Polston v. State, 360 Ark. 317, __ S.W.3d __, 2005 WL 107132, at *5 (Ark. 2005); In re the Appeal in Maricopa County Juvenile Action Nos. JV-512600 and JV-512797, 930 P.2d 496, 500-01 (Ariz. 1996); People v. Adams, 9 Cal.Rptr.3d 170, 183-84 (Cal. Ct. App. 2004); L.S. v. State, 805 So.2d 1004, 1006-07 (Fl. Dist. Ct. App. 2001); People v. Calahan, 649 N.E.2d 588, 592 (Ill. App. Ct. 1995); State v. Martinez, 78 P.3d 769, 775 (Kan. 2003); Raines, 857 A.2d at 21; Landry v. Attorney General, 709 N.E.2d 1085, 1092 (Mass. 1999); Cooper v. Gammon, 943 S.W.2d 699, 705 (Mo. Ct. App. 1997); Gaines v. State, 998 P.2d 166, 172 (Nev. 2000) (per curiam); State v. Steele, 802 N.E.2d 1127, 1137 (Ohio Ct. App. 2003); State ex rel. Juvenile Dep't v. Orozco, 878 P.2d 432, 435-36 (Or. Ct. App. 1994) (in banc); Dial v. Vaughn, 733 A.2d 1, 7 (Pa. Cmwlth. 1999); In re D.L.C., 124 S.W.3d 354, 373 (Tex. App. 2003); Johnson v. Commonwealth, 529 S.E.2d 769, 779 (Va. 2000); State v. Olivas, 856 P.2d 1076, 1088 (Wash. 1993) (en banc); Doles v. State, 994 P.2d 315, 319 (Wyo. 1999).

The courts considering these Fourth Amendment challenges have not been unanimous in their analysis, however. Some have found the legislation at issue valid under the traditional "totality of the circumstances" approach. See, e.g., Sczubelek, 402 F.3d at 184; Padgett, 401 F.3d at 1280; Groceman, 354 F.3d at 413; Jones, 962 F.2d at 307; Raines, 857 A.2d at 27; Doles, 994 P.2d at 319. Other courts have upheld the challenged legislation after finding that the government's interest in collecting the DNA is a "special need" beyond the normal need for law enforcement. See, e.g., Nicholas, 430 F.3d at 672; Berge, 354 F.3d at 679; Kimler, 335 F.3d at 1146; Olivas, 856 P.2d at 1086. Upon our review of these and other cases, we have determined that searches of incarcerated felons undertaken pursuant to Tennessee's DNA collection statute pass constitutional muster when they are reasonable under all of the circumstances. We turn now to an examination of the circumstances surrounding the collection of a biological specimen from Scarborough pursuant to the DNA collection statute.

## V. Scarborough

Scarborough's blood was drawn while he was incarcerated following his convictions of felonies committed after July 1, 1998. The DNA collection statute required Scarborough to provide this biological specimen irrespective of any consent he may have granted or withheld.[8] While we recognize that prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement in prison," Bell v. Wolfish, 441 U.S. 520, 545 (1979), prisoners do not enjoy the breadth and depth of Fourth Amendment protection accorded law-abiding citizens. See Padgett, 401 F.3d at 1278 (recognizing that prisoners "do not enjoy the same Fourth Amendment rights as free

---

[8]Scarborough's conviction of sexual battery, Tenn. Code Ann. § 39-13-505(a), also brought him within the purview of the DNA collection statute. Id. § 40-35-321(b).

persons"). Rather, "courts have recognized that prisoners comprise a separate category of persons for purposes of the [Fourth] Amendment." Id. at 1278-79; see also Raines, 857 A.2d at 33 (recognizing that "incarcerated persons have a severely diminished expectation of privacy"). The United States Court of Appeals for the Fifth Circuit has gone so far as to declare bluntly that "persons incarcerated after conviction retain no constitutional privacy interest against their correct identification." Groceman, 354 F.3d at 413-14; see also Kincade, 379 F.3d at 837 n.32 (recognizing that "[t]hose who have suffered a lawful conviction lose an interest in their identity to a degree well-recognized as sufficient to entitle the government permanently to maintain a verifiable record of their identity; not merely sporadically to demand its production under independently lawful conditions"). These cases make clear that Scarborough's status as an incarcerated felon reduced significantly his expectation of privacy under the Fourth Amendment. Scarborough's interest in keeping private his biological identity is also lessened by the fact that Tennessee "likely already has a plethora of identifying information about [him], in light of [his] status as convicted felon[]." Nicholas, 430 F.3d at 671.

Additionally, the intrusion occasioned by a blood draw "is not significant." Skinner, 489 U.S. at 425 (citing Schmerber v. California, 384 U.S. 757, 771 (1966)); see also Winston v. Lee, 470 U.S. 753, 762 (1985) (recognizing that "blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity") (citing Schmerber, 384 U.S. at 771) (footnote omitted). In the context of DNA analysis, it appears that the intrusion occasioned by a blood draw may even become unnecessary as technology progresses and allows the biological specimen to be obtained through measures requiring no physical invasion whatsoever. As noted by Judge Raker in his concurring opinion in Raines, "[i]t is now possible to 'extract DNA by applying a sticky patch to the skin on an individual's forearm for a moment to acquire epidermal cells without puncturing the skin surface.'" 857 A.2d at 47 n.3 (quoting B. Quarmby, *The Case for National DNA Identification Cards*, 2003 Duke L. & Tech. Rev. 2, 20 (2003)) (Raker, J., concurring). We are mindful, however, that the DNA analysis performed after the collection of the biological specimen is a separate and distinct search which "is potentially a far greater intrusion than the initial extraction of DNA, since the state analyzes DNA for information and maintains DNA records indefinitely." Nicholas, 430 F.3d at 670. As noted by Judge Gould in his concurring opinion in Kincade, "DNA stores and reveals massive amounts of personal, private data . . . and the advance of science promises to make stored DNA only more revealing in time." 379 F.3d at 842 n.3 (Gould, J., concurring). However, Tennessee's DNA collection statute specifies that the biological specimen obtained from felons is to be analyzed "for identification purposes." Tenn. Code Ann. § 40-35-321(a). Thus, as noted by many courts before us, the second search serves as a form of "fingerprinting" so as to provide a statistically precise method of identifying a single[9] individual: a method that the subject cannot impugn by altering his or her appearance.

---

[9]The exception to the rule of DNA being idiosyncratic as to each and every individual is in the case of identical siblings. See Sczubelek, 402 F.3d at 181 n.2; Raines, 857 A.2d at 22 n.7.

We next consider the regime under which the blood specimen was drawn. As noted above, the Fourth Amendment generally requires a search to be preceded by a warrant issued upon probable cause. This limitation serves to protect our citizenry from the potential abuses of unlimited discretion by law enforcement agents and officers. The blood draw at issue in Scarborough's case, however, was not the product of any particular law enforcement officer's individual decision to intrude upon his privacy. Rather, the challenged draw was the product of a statutory scheme that is aimed at certain classes of convicted felons. If the subject has been convicted of committing a specified crime, the subject is required to provide a biological specimen for DNA analysis. The statute allows for no discretion as to who will be required to provide a specimen. Neutral oversight to protect against overzealous law enforcement officers exercising unfettered discretion is therefore not necessary. This statutory regime, which is "discretion-less" in its coverage, weighs in favor of the reasonableness of the searches. See Von Raab, 489 U.S. at 667 (opining that warrant to obtain urine test of Customs employee was not necessary in part because the search regime involved no discretion by officers in the field).

Scarborough's blood was obtained not only without a warrant, it was obtained with no individualized suspicion of any particular wrongdoing by him. However, the DNA testing performed pursuant to the DNA collection statute is not aimed at discovering incriminating evidence of particular criminal activity by the donors. See Raines, 857 A.2d at 29 n.11 (noting that a DNA collection act does not result in gathering direct evidence of a crime). Rather, the instant searches were undertaken to further establish Scarborough's identity. See Berge, 354 F.3d at 678 (noting that "[t]he primary purpose of the Wisconsin DNA law . . . is not to search for 'evidence' of criminal wrongdoing . . . [but] to obtain reliable proof of a felon's identity"). The state's interest in Scarborough's identity was triggered not by any individualized suspicion that he had engaged in any particular criminal activity prior to the blood draw, but rather as incidental to his demonstrated willingness to commit certain felony offenses. The concerns addressed by the general requirement of some level of individualized suspicion were therefore not present during the instant searches. Indeed, as recognized by Maryland's high court, "[r]equiring individualized suspicion to obtain DNA for future use would negate the very purpose of the Act itself, considering that the Act does not seek to obtain evidence, but to merely identify persons." Raines, 857 A.2d at 29; see also Jones, 962 F.2d at 306-07 (concluding that "the Fourth Amendment does not require an additional finding of individualized suspicion before blood can be taken from incarcerated felons for the purpose of identifying them") (footnote omitted). Accordingly, Scarborough's rights under the Fourth Amendment were not violated simply because the instant blood draw was taken without any level of individualized suspicion.

We turn now to the government's interest in drawing Scarborough's blood and then analyzing it. As set forth above, Scarborough's blood was drawn in order to establish his identity through DNA analysis. As recognized by the United States Court of Appeals for the Fourth Circuit, "[t]he governmental justification for this form of identification . . . relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods." Jones, 962 F.2d at 307. The government's interest in correctly identifying those who have broken its laws

is obvious:

> It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features. Traditional methods of identification by photographs, historical records, and fingerprints often prove inadequate. The DNA, however, is claimed to be unique to each individual and cannot, within current scientific knowledge, be altered. The individuality of the DNA provides a dramatic new tool for the law enforcement effort to match suspects and criminal conduct. Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or left at the scene of a crime within samples of blood, skin, semen or hair follicles.

Id. Moreover, as recognized by the United States Court of Appeals for the Third Circuit,

> [a] DNA database promotes increased accuracy in the investigation and prosecution of criminal cases. It will aid in solving crimes when they occur in the future. Equally important, the DNA samples will help to exculpate individuals who are serving sentences of imprisonment for crimes they did not commit and will help to eliminate individuals from suspect lists when crimes occur. While the presence of [a felon's] DNA in CODIS may inculpate him in the future, it may also exonerate him. The interest in accurate criminal investigations and prosecutions is a compelling interest that the [federal] DNA Act can reasonably be said to advance.

Sczubelek, 402 F.3d at 185 (footnote omitted); see also Raines, 857 A.2d at 33 ("The DNA profile thus serves the purpose of increasing the efficiency and accuracy in identifying individuals within a certain class of convicted criminals. The purpose is akin to that of a fingerprint."). We agree with the many courts that have preceded us that the government's interest in conducting these searches is weighty, indeed. See, e.g., Raines, 857 A.2d at 31 (recognizing "the compelling government interest in identifying persons involved with crimes"); Nicholas, 430 F.3d at 669 (finding that "New York has a strong governmental interest in obtaining identifying information from convicted offenders and keeping a record of such information"); Sczubelek, 402 F.3d at 185 (recognizing that "[t]he interest in accurate criminal investigations and prosecutions is a compelling interest"). This factor also weighs in favor of the reasonableness of searches conducted pursuant to the DNA collection statute.

In sum, our legislature has put into place a method of more accurately identifying those who commit and are convicted of felonies, thereby enabling law enforcement personnel to more quickly and accurately exonerate the innocent and prosecute the perpetrators. The gravity of the public concern served by the instant searches is therefore significant. Given the heightened accuracy of DNA analysis compared to more traditional methods of identification, such as fingerprints and eyewitness testimony, the degree to which the DNA collection statute advances that interest is also

significant. Additionally, Tennessee's DNA collection statute clearly and unambiguously specifies who is subject to the searches: the risk of arbitrary or capricious searches is therefore eliminated. Further, no measure of individualized suspicion is necessary because the searches are not aimed at recovering incriminating evidence of contemporaneous criminal conduct. Finally, we have determined that the convicted felons subject to search pursuant to the statute have a significantly reduced expectation of privacy. Accordingly, we agree with the high court of Maryland in its rejection of a Fourth Amendment challenge to Maryland's DNA collection statute:

> a search like the one authorized by the Act in this case, whose primary purpose is to identify individuals with lessened expectations of privacy, is totally distinguishable from a search of ordinary individuals for the purpose of gathering evidence against them in order to prosecute them for the very crimes that the search reveals.

Raines, 857 A.2d at 33.

Applying the totality of the circumstances test, we conclude that the blood draw from Scarborough and its subsequent analysis, both conducted pursuant to Tennessee's DNA collection statute, were reasonable under all of the circumstances and therefore did not violate Scarborough's rights under the Fourth Amendment.[10]

## VI. Article I, Section 7 of the Tennessee Constitution

Similarly to the Fourth Amendment, the Tennessee Constitution provides:

> That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

TENN. CONST. art. I, § 7. This Court has long held that Tennessee's constitutional provision is identical in intent and purpose with the United States Constitution. Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968). For the same reasons we have determined the instant searches did not contravene the Fourth Amendment, we conclude they did not violate Scarborough's rights against unreasonable searches and seizures under the Tennessee Constitution.

In response to Scarborough's motion to suppress, the State argued below that Scarborough consented to the blood draw by signing a document titled "Consent for DNA Analysis." Scarborough contends that his consent was coerced because he was threatened with disciplinary

---

[10]Because we uphold the instant searches under a totality of the circumstances approach, we need not address whether they would satisfy a "special needs" analysis.

action if he did not consent. Because we have determined that the State may legitimately compel the provision of a biological specimen from incarcerated felons pursuant to the DNA collection statute, we need not address whether Scarborough also consented to the searches.

The judgment of the Court of Criminal Appeals is affirmed in all respects as to Scarborough.

## VII. Transou

### A. Validity of Blood Draw

Although defendant Transou's cases were consolidated for oral argument with that of defendant Scarborough based on his similar claims of the invalidity of the DNA collection statute, we do not rely on that statute in resolving his cases. When he submitted to a blood draw in September 1999,[11] Transou did not fall within the parameters of the DNA collection statute.[12] Rather, the trial court upheld the blood draw/search on the basis that Transou consented to it. The Court of Criminal Appeals affirmed the trial court. We agree that the Transou cases are not governed by the statute and that he validly consented to the blood draw and its subsequent analysis.

Whether an individual consents voluntarily to a search otherwise proscribed by either the state or federal constitutions is a question of fact to be determined from the totality of the circumstances. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); Cox, 171 S.W.3d at 184. The consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" State v. Simpson, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992)). "The pertinent question is this: whether the [individual's] act of consenting is the product of an essentially free and unconstrained choice. If the [individual's] will was overborne and his or her capacity for self-determination critically impaired, due process is offended." Cox, 171 S.W.3d at 185 (citing Schneckloth, 412 U.S. at 225-26). In considering this question, numerous factors come into play, including the time and place of the encounter; whether the encounter occurred in a secluded or public place; the number of officers present; whether hostility was present; whether weapons were displayed; whether consent was requested; and whether the individual initiated the contact. See id. We may also consider the individual's personal characteristics, including his or her age, education, intelligence, knowledge, maturity, sophistication, experience, and prior contact with law enforcement personnel. Id. The individual's knowledge of his or her right to refuse consent is also an appropriate circumstance to consider. Id.

In this case, Transou was requested to submit to a blood draw in conjunction with standard

---

[11]Transou contends before this Court that the trial court "erred by retroactively applying a 1999 statute requiring blood and DNA samples to be taken from inmates." However, the record is clear that the trial court did not apply the DNA collection statute to Transou and this contention is therefore without merit.

[12]The offense for which he was incarcerated was committed before July 1, 1998, and was not one of the specific qualifying offenses noted in the DNA collection statute.

intake procedures at the prison facility. During the intake procedure, Transou was one of a group of inmates addressed simultaneously by medical personnel. There is no indication in the record that either hostility or weapons were present. Transou was verbally informed that he could refuse to consent to the blood draw.

In addition to the verbal explanation, Transou was provided with a written form on which he could indicate his consent or refusal to consent. This form indicates that only inmates with certain convictions are required to provide a biological specimen for DNA analysis. Transou had not been convicted of any of the predicate offenses. The form also indicates that an inmate who refuses to provide a specimen may be subject to disciplinary action, but that those who refuse will be provided a due process hearing.

In September 1999 Transou was forty years old. Although he denied having obtained a GED, he admitted to being familiar with the prison's law library to such an extent that he drafted and filed legal pleadings on his own behalf. He further admitted to having spent a considerable amount of his adult life in custody, evincing a significant familiarity with the criminal justice system. With respect to the blood draw at issue, Transou admitted during his testimony at the suppression hearing that he had previous familiarity with the DNA consent form and that he was aware that the DNA collection statute did not apply to him in September 1999.

Transou maintains that he was coerced into signing the consent form with the threat of disciplinary action upon refusal, rendering his consent invalid. We disagree. As set forth above, the Consent for DNA Analysis form provides that an inmate who refuses to consent to a blood draw will be subject to a hearing before the disciplinary board. If the board then convicts the inmate of a disciplinary offense, "he/she shall forfeit the opportunity to earn behavior sentence credits until such time he/she provides a biological specimen." Thus, an inmate who refuses to consent to a blood draw for DNA analysis may lose the opportunity for an earlier release than otherwise anticipated. See Tenn. Code Ann. § 41-21-236 (setting forth the provisions for the accrual of inmate sentence reduction credits which result in the adjustment of an inmate's release eligibility and sentence expiration dates).

Before that opportunity loss can occur, however, the inmate must first be convicted of a disciplinary offense. Transou was not subject to such a conviction because he did not fall within the purview of the DNA collection statute. The Department of Correction had no basis under that statute upon which to demand that Transou provide a biological specimen. Transou knew that he did not fall within the purview of the statute. The Department of Correction's "threat," therefore, was empty as to Transou.[13]

The trial court rejected Transou's contention that he had been coerced into consenting to the blood draw, impliedly finding Transou's testimony on this point not credible. On the specific facts

---

[13]We need not decide in this case whether the Department of Correction may properly discipline an inmate for refusing to provide a biological specimen where the inmate is not subject to the DNA collection statute.

of this case, we conclude that Transou has failed to demonstrate that the proof preponderates against the trial court's findings. Rather, the record demonstrates that Traunsou is both intelligent and knowledgeable about his rights. He is furthermore unafraid to assert them. Transou intelligently, knowingly, and voluntarily consented to have his blood drawn and analyzed in September 1999. Accordingly, we hold that the trial court did not err in refusing to suppress the evidence obtained as a result of the September 1999 blood draw to which Transou consented.

## B. Sufficiency of Convicting Evidence

As to victim S. K., Transou was convicted of one count of rape and one count of aggravated burglary. Transou does not contend that these crimes were not committed against the victim, but contends that, without the DNA evidence, the proof is not sufficient to establish his identity as the perpetrator.

When evaluating the sufficiency of the evidence, we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). In making this determination, we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of the witnesses, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the trier of fact. Id. Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the defendant upon conviction bears the burden of showing why the evidence is insufficient to support the verdict. State v. Rice, 184 S.W.3d 646, 661 (Tenn. 2006); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We have determined that the DNA evidence developed from Transou's September 1999 blood draw was properly obtained. As a result of that evidence, a conclusive match was made between Transou's DNA and the DNA of S. K.'s rapist. In addition, at trial the victim identified Transou as her attacker after providing a general description of him. An investigating officer testified about a similar description given by the victim on the morning of the attack. We hold that the evidence of Transou's identity in the commission of these crimes is sufficient to support his convictions. Transou is entitled to no relief on this basis.

## C. Sentencing

Transou also appeals from the sentences he received for these two convictions, but only insofar as preserving his appellate rights in the event the United States Supreme Court decides to review this Court's decision in State v. Gomez, 163 S.W.3d 632 (Tenn. 2005), petition for cert. filed, 74 U.S.L.W. 3131 (U.S. Aug. 15, 2005) (No. 05-296). In Gomez, we determined that Tennessee's Criminal Sentencing Reform Act of 1989 does not violate the Sixth Amendment to the United States Constitution as interpreted by the United States Supreme Court in Blakely v. Washington, 542 U.S. 296 (2004), and its progeny. Id. at 661.

For his rape conviction, a Class B felony, see Tenn. Code Ann. § 39-13-503(b), Transou was sentenced as a Range II offender to sixteen years. See id. § 40-35-112(b)(2). For his aggravated burglary conviction, a Class C felony, see id. § 39-14-403(b), Transou was sentenced as a Range III offender to a concurrent term of fifteen years. See id. § 40-35-112(c)(3). In imposing these sentences, the trial court applied a single mitigating factor: that Transou's conduct did not cause or threaten serious bodily injury. See id. § 40-35-113(1). The trial court also applied two enhancement factors: that Transou has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, and Transou has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. See id. § 40-35-114(2), (9).

Our review of the record establishes that Transou's sentences were imposed in compliance with the Sentencing Act. Under Gomez, his sentences are also in compliance with the Sixth Amendment. Transou is entitled to no relief as to his sentences. Accordingly, we affirm the judgment of the Court of Criminal Appeals as to Transou in all respects.

## CONCLUSION

We hold that the taking of a blood sample from a convicted and incarcerated felon pursuant to Tennessee's DNA collection statute is a search, but that it does not violate the Fourth Amendment to the United States Constitution or article I, section 7 of the Tennessee Constitution when it is reasonable under the totality of the circumstances. We further hold that the subsequent DNA analysis performed upon the biological specimen likewise passes constitutional muster. Accordingly, the trial court did not err in denying defendant Scarborough's motion to suppress the evidence obtained pursuant to the blood draw he submitted pursuant to the DNA collection statute.

We also hold that, while the DNA collection statute was not applicable to defendant Transou based on the offense for which he was serving time in 1999, Transou validly consented to the blood draw taken in September 1999. Accordingly, the trial court in his cases did not err in denying Transou's motions to suppress the evidence obtained from the blood draw to which he consented. We further hold that the evidence is sufficient to support Transou's convictions of the rape of S. K. and the aggravated burglary of her residence, and that his sentences are valid.

The judgments of the Court of Criminal Appeals in all three cases are affirmed. It appearing that Defendants Scarborough and Transou are indigent, the costs of these consolidated appeals are taxed to the State of Tennessee, for which execution may issue.

_____
CORNELIA A. CLARK, JUSTICE