IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 24, 2015 Session

**STATE OF TENNESSEE v. MARGARET LAVERNE RIDDLE**

**Direct Appeal from the Circuit Court for Blount County**
**No. C-17351    David R. Duggan, Judge**

—————————

**No. E2014-01037-CCA-R3-CD – Filed December 29, 2015**

—————————

A Blount County Circuit Court Jury convicted the Appellant, Margaret Laverne Riddle, of one count of vehicular homicide.  On appeal, the Appellant challenges the trial court's denial of her motions to suppress the results of a blood alcohol test, arguing that (1) the State did not have valid consent to obtain the sample and (2) her due process rights were violated by the destruction of the blood sample before she was indicted and could have the sample tested.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT L. HOLLOWAY, JR., JJ., joined.

Robert W. White, Maryville, Tennessee, for the Appellant, Margaret Laverne Riddle.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Michael L. Flynn, District Attorney General; and Ryan Desmond, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On May 5, 2008, a Blount County Grand Jury returned an indictment charging the Appellant with vehicular homicide by intoxication.  The charge stemmed from a June 14, 2007 wreck in which the Appellant's Ford Mustang crashed into the rear of the victim's motorcycle, which was stopped at a traffic light.  The victim, John E. Younce, Jr., died from injuries caused by the impact.  The Appellant's blood was drawn shortly after the accident, and testing revealed that her blood alcohol content was .15.

Prior to trial, the Appellant filed two motions to suppress the results of the blood alcohol test. In one motion, the Appellant argued that the State did not have probable cause to obtain the sample and that she did not voluntarily, knowingly, and intelligently consent to the test. In the other motion, the Appellant contended that the State violated her due process rights by destroying the blood sample before she was charged, thus denying her the ability to have the sample independently tested.

At a hearing on the motions, Dustin Cook testified that on June 14, 2007, he was a patrol officer with the Alcoa Police Department and that he was dispatched to a motor vehicle crash involving injury at the intersection of Hall Road and Associates Boulevard. When he arrived at the scene, the victim, who had been riding a motorcycle, was lying on the road, and paramedics were performing cardiopulmonary resuscitation (CPR) on him. The Appellant was sitting in her vehicle. She appeared "hysterical" and "shaken up."

Officer Cook testified that he asked the Appellant to perform some field sobriety tests and that she agreed. He opined that she did "[f]airly well" on the tests. During the tests, the Appellant stated she had not consumed any alcohol in two weeks but later acknowledged that she had consumed a couple of beers earlier that day. Nevertheless, Officer Cook did not think he had probable cause to arrest her for driving under the influence (DUI). Officer Cook asked if the Appellant would submit to a blood test, and she agreed to give blood. In fact, the Appellant stated a couple of times that she wanted to have a blood test. Officer Cook said that he read the Appellant part of the implied consent form;[1] he did not read the entire form because parts of it did not apply due to the fact that the Appellant was not under arrest and had "voluntarily wanted to give blood."

On cross-examination, Officer Cook acknowledged that the Appellant may have said that she had not consumed any alcohol in two weeks before the day of the incident. Officer Cook took the Appellant to Blount Memorial Hospital to have her blood drawn. Officer Cook said that while they were at the hospital, he filled out a form to request that the Tennessee Bureau of Investigation (TBI) test the blood sample. On the form, he checked boxes indicating that the incident involved DUI and a motor vehicle accident. Officer Cook also checked a box indicating that the incident involved a vehicular homicide; however, he crossed out that box because, at the time, he did not know the victim had died.

Officer Cook testified that in his opinion, the Appellant did not demonstrate enough "cues" on the field sobriety tests to justify an arrest. He did not recall smelling

---

[1]Tennessee Code Annotated section § 55-10-406(a) provides, in pertinent part, that "[a]ny person who drives a motor vehicle in this state is deemed to have given consent to a test or tests for the purpose of determining the alcoholic content of that person's blood, a test or tests for the purpose of determining the drug content of the person's blood, or both tests."

alcohol on her. The Appellant said she had consumed two beers earlier that day but did not give a specific time. Officer Cook did not recall taking possession of the Appellant's driver's license, explaining that he thought Officer Brett Romer had taken her license. Officer Cook did not know when the Appellant's driver's license was returned to her.

On redirect examination, Officer Cook testified that after the blood sample was collected, he took it to the Alcoa Police Department and entered it into evidence. Thereafter, a crime scene technician removed the sample and took it to the TBI for testing.

Lieutenant Paul Gilbert testified that he spoke with the Appellant at the scene and smelled alcohol on her. Before she performed the field sobriety tests, Lieutenant Gilbert "asked her, due to the magnitude of the accident and serious bodily injury, I was requesting that she submit to a blood alcohol test." The Appellant responded, "[T]hat's fine." Lieutenant Gilbert said that the Appellant stated at least twice that it was "okay" for her blood to be drawn for testing.

On cross-examination, Lieutenant Gilbert clarified that he said to the Appellant, "Okay. When we have an accident of this magnitude with serious bodily injury we have to request that you take a blood alcohol test. Okay?" The Appellant responded either "[o]kay" or "[f]ine." Lieutenant Gilbert said that he was in close proximity to the Appellant when he detected a moderate odor of alcohol. He acknowledged that she exhibited no other signs of intoxication. Lieutenant Gilbert said that he never took possession of the Appellant's driver's license and that he thought Officer Cook obtained her license.

Alcoa Police Sergeant Bud Cooper testified as an expert in accident reconstruction. He said that the accident was reported to the police dispatcher at 9:34 p.m. Sergeant Cooper said that the night was warm and humid, that it had not been raining, and that the road conditions were clear. At the scene, Sergeant Cooper determined that the point of impact was at the white stop line on the southbound lane of Hall Road where it intersected with Associates Boulevard. The Appellant's Ford Mustang was in the middle of the intersection on the southbound side.

Sergeant Cooper found scuff marks from the victim's heels on the road. He deduced that at the time of impact, the traffic light was red or had just turned green and that the victim was stopped with his feet on the ground. Sergeant Cooper estimated the Mustang was traveling at 54.9 miles per hour at the time of impact; the speed limit in the area was 45 miles per hour. Sergeant Cooper found no deceleration or brake marks to indicate the Appellant tried to slow or stop the Mustang before the collision. Upon impact, the victim was "ejected off the hood and windshield of the Mustang and landed on the ground, tumbled, and came to final rest[.]"

Sergeant Cooper opined that the Appellant was at fault for the crash. Sergeant Cooper said that he spoke briefly with the Appellant at the scene and that she stated she had not paid attention to the traffic light. Sergeant Cooper, who was standing three to four feet away from the Appellant during the conversation, detected an odor of alcohol coming from her. Afterward, he asked Lieutenant Gilbert if he intended to administer field sobriety tests, and Lieutenant Gilbert responded in the affirmative.

Stephanie Dotson, a special agent forensic scientist with the TBI, testified that laboratory records reflected that the Appellant's blood sample was hand-delivered to the laboratory in a sealed blood alcohol kit then stored in a secured lockbox. On June 18, 2007, evidence technician Debra White removed the kit from the lockbox and placed it in a refrigerated unit in a vault. The next day, White removed the kit from the vault, opened it, and compared its contents with the information on the request for testing form filled out by an officer. White assigned the kit a laboratory number and returned the kit to the vault. On June 21, 2007, evidence technician Leann Corbitt removed the kit from the vault and transferred it to Dotson for testing. When Dotson tested the blood, she discovered it had a blood alcohol content of .15 gram percent.

Dotson testified that TBI policy dictated that no drug screen would be performed in a DUI or motor vehicle accident case if the blood alcohol content of a sample was greater than .08. However, if the underlying event was a rape or involved a death, a drug screen was always performed, regardless of the blood alcohol content. Dotson said that on the testing request form in the instant case, the officer had checked a box indicating that a vehicular homicide had occurred but then marked out the box. Accordingly, she did not perform a drug test on the Appellant's blood sample.

Dotson testified that after she tested the blood sample, she put the sample into a "destroy holding bin" on June 26, 2007. She stated that the TBI's policy was to keep the samples for a minimum of sixty days before destroying them but that "we do have more of a grace period than that. They're usually kept for a few months at least." On November 2, 2007, the sample was removed from the destroy bin and put into a biohazard bin that was picked up by a medical waste facility for disposal.

On cross-examination, Dotson acknowledged that she did not contact the officer for clarification of the "scribbled out" box on the request for testing form.

Dotson testified that the blood sample consisted of two vials that contained a total of approximately eighteen milliliters. Her tests used approximately one milliliter of blood, and additional testing could have been done on the remaining blood. She said the sample had no "issues," such as clotting. She further stated that blood samples could be "maintain[ed]" in a refrigerated environment and that blood alcohol content could be

accurately tested for several years. However, the test result "may differ slightly. It may decrease slightly." Moreover, at the time the Appellant's blood sample was tested, the TBI crime laboratory was "at our old facility. We had less storage space there." Dotson said that any request to maintain a blood sample was noted in the case file, even if the request was received after the sample was destroyed. She stated that no such request was noted in the case file regarding the Appellant's blood sample.

The parties entered the following stipulation regarding the proposed testimony of the former prosecuting attorney, who was no longer with the attorney general's office:

> [O]n or before December 14th, 2007, per a telephone conversation between [defense counsel and the former prosecuting attorney, defense counsel] requested on behalf of [the Appellant], his client, that [the former prosecuting attorney] request of the Tennessee Bureau of Investigation that they preserve a sample of [the Appellant's] blood for independent testing by [the Appellant]. [The former prosecuting attorney] received a letter from [defense counsel] confirming this request on December 14th, 2007.
>
> . . . .
>
> As a result of the conversation and the request of [defense counsel, the former prosecuting attorney] confirmed with the TBI that th[e] sample had, in fact, already been destroyed pursuant to TBI policy.

Defense counsel argued that the police had no probable cause to arrest the Appellant or to request a blood test, citing the Appellant's passing performance on the field sobriety tests and Officer Cook's failure to smell alcohol on her. Defense counsel further argued that because the Appellant was not arrested, she had no notice that she needed to defend herself against any criminal charges, including having her blood sample independently tested. Defense counsel complained that "some six months before she's ever on any formal notice that she has to defend herself against any criminal allegation, that sample is destroyed." Defense counsel contended:

> [W]hen you take it in conjunction with the video, I think the Court can clearly see that there's the potential there that [the blood sample] is exculpatory evidence. Because someone has a blood alcohol test that is an eyelash shy of being twice the legal limit, it calls into question the accuracy of that test when you watch that video. It doesn't jibe.

The State argued that the police had probable cause to arrest the Appellant and to request a blood alcohol test, noting that the Appellant was at fault for the crash, that she admitted consuming alcohol prior to the collision, and that two officers smelled alcohol on her immediately after the crash. Additionally, the State contended that the blood test results were not the only evidence of the Appellant's guilt, again citing her admission of consuming alcohol and the smell of alcohol.

The trial court found that from the time her blood was drawn, the Appellant had the opportunity to have the sample preserved and independently tested but that she may not have had the "incentive" to do so prior to being formally charged. The court also found that the State had no duty to preserve the blood sample, that the State was not negligent in destroying the sample, that the blood sample was destroyed in compliance with the TBI's policy, and that the State was acting in good faith when the sample was destroyed. The court found that because the test revealed a blood alcohol content of .15, the evidence had no apparent exculpatory value prior to its destruction. The court agreed with the State that the test was not the only evidence against the Appellant, noting her admission that she had consumed two beers that day and the two officers' statements that they smelled smell alcohol on her after the crash.

The court further found that Lieutenant Gilbert did not tell the Appellant that she was required to submit to a blood alcohol test; instead, he told her that he had to request that she take the test. Moreover, the court observed that on the video, the Appellant readily agreed to the blood test and that she sounded "eager to give blood." The court also observed that during the field sobriety tests, the Appellant "arguably asked for a blood alcohol test" when she asked Officer Cook, "'Why don't you just do an alcohol test?'" Finally, the court found that the Appellant signed the implied consent form even though she was not under arrest at the time. Based upon these facts, the court found that the Appellant knowingly, voluntarily, and intelligently consented to the blood test. Based upon the foregoing, the court denied the Appellant's motions to suppress the blood test results.

At trial, the victim's widow, Suzanne Younce James, testified that she and the victim had been married for twenty-five years at the time of his death. She said that the victim was a "[v]ery big" man, standing six feet, three inches tall and weighing between 250 and 300 pounds. Mrs. James said that a few months prior to the crash, the victim bought a red, white, and blue "Chopper" motorcycle and that he drove it a couple of days each week. Mrs. James said that the taillights on the victim's motorcycle functioned properly.

Mrs. James said that around 8:30 p.m. on June 14, 2007, the victim called her from his transmission shop to tell her he was on his way home from work. Shortly thereafter,

an officer came to her house and informed her that the victim had been killed in an accident.

Denton Paul Bowers testified that on the night of June 14, 2007, he was working at REMCO, which was located near the intersection of Hall Road and Associates Boulevard. During a break, he and his co-worker, Robert Kunkle, went outside to stand in the parking lot. They could see the intersection and occasionally watched traffic. Bowers said that the sun had set; that it was "dusky dark," not "dark-dark"; and that the intersection was well-lit by streetlights. His attention was drawn to the intersection when he heard the "rev-up" of a motorcycle. At the nearby traffic light, a motorcycle was stopped in the left lane, which led into town. Approximately two seconds later, Bowers saw the Mustang hit the motorcycle; however, he did not hear the car's driver apply the brakes prior to the impact. Bowers said that the entire front end of the Mustang was "demolished" and that the motorcycle had been knocked through the intersection.

Bowers testified that he called 911 to report the accident. The ambulance arrived, and emergency medical service (EMS) workers performed CPR on the victim.

Robert Kunkle testified that around sunset on the night of June 14, 2007, he was standing in the parking lot of REMCO when he heard a crash; he did not hear tires squealing or brakes being applied prior to the collision. Afterward, he saw steam coming out of the maroon Mustang; the front end of the car was "all smashed up and the bumpers were sticking out on it." He said that the motorcycle was red and had an American flag on the gas tank. He acknowledged, however, that he did not see the actual impact. He recalled that EMS workers arrived almost immediately after Bowers called 911.

On cross-examination, Kunkle testified that the wreck occurred after the sun had set but while "it was still daylight." He did not think the streetlights were on at the time. He conceded that "visibility [was] an issue at that intersection," noting that at night, the intersection was not well-lit because the streetlights were not very bright. Nevertheless, he again asserted that "[i]t was daylight" at the time of the crash.

Sergeant Bud Cooper testified, without objection, as an expert in the field of crash reconstruction. He arrived at the scene of the crash around 9:46 or 9:47 p.m. At that time, the victim was on a gurney and was being loaded into an ambulance. Sergeant Cooper saw a motorcycle on its side in the left lane, which was the southbound side of Hall Road. A red or maroon Mustang was in the middle of the intersection. Sergeant Cooper noticed that the victim's heels had left scuff marks on the pavement, indicating he had both feet on the ground at the time of impact. Sergeant Cooper determined that the Mustang left skid marks on the asphalt after the point of impact but not before the point of impact. The damage to the Mustang's hood indicated that after the collision, the victim was thrown from the motorcycle and that his back and head hit the hood of the

Mustang. Sergeant Cooper noticed that red paint had been transferred to the rear tire of the motorcycle and that the rear fender was "really up and pinched the seat," which suggested that the car struck the rear of the motorcycle. Sergeant Cooper estimated that the Mustang was traveling 54.9 miles per hour at the time of the accident; the speed limit in the area was 45 miles per hour. Sergeant Cooper summarized that "the motorcycle was sitting still at the stop sign – or stop light, with his feet on the ground, and the driver of the Mustang ran over him – actually ran up the rear end of the motorcycle."

Sergeant Cooper testified that in his opinion, based on his own experience, the intersection of Hall Road and Associates Boulevard was well-lit at night. He also stated that when he arrived at the scene after the crash, the street lights were on and that he had no issues with visibility.

Sergeant Cooper testified that he spoke with the Appellant after the crash. She told him that she had been on her way home when she approached the intersection. She said that she saw the traffic light turn from red to green and proceeded through the intersection. She also said that she was not paying attention and did not see the motorcycle before the crash. As Sergeant Cooper spoke with the Appellant, he noticed a "slight odor" of alcohol coming from her.

On cross-examination, Sergeant Cooper acknowledged that a specialty motorcycle, such as the victim's, might have been difficult to see if it were "not lit up very well." He noted that the victim was wearing a t-shirt, a black leather vest, blue jeans, and boots with rubber heels at the time of the crash.

Dr. Darinka Mileusnic-Polchan, an expert in forensic pathology, testified that she was the Chief Medical Examiner for Knox and Anderson Counties and that she also performed autopsies for surrounding counties, including Blount County. In June 2007, when the victim's autopsy was performed, Dr. Mileusnic-Polchan and Dr. Sandra Elkins were the only two medical examiners in the office.[2] Dr. Mileusnic-Polchan acknowledged that Dr. Elkins performed the victim's autopsy and prepared the autopsy report; however, Dr. Mileusnic-Polchan asserted that she was "aware of this particular case."

Dr. Mileusnic-Polchan testified the victim was six feet, two and one-half inches tall and weighed 373 pounds. He was wearing a leather vest, a t-shirt, jeans, and boots and had a leather glove on his right hand when he was brought into the medical examiner's office. A piece of metal in the shape of the Ford Mustang logo was discovered on the back of the victim's shirt. The victim's left arm, shoulder, knee, and

---

[2]Dr. Mileusnic-Polchan testified that at the time of trial, Dr. Elkins was no longer with the medical examiner's office.

shin had abrasions and contusions, and a "road rash" was on the left side of his stomach, which indicated he landed on his left side on the pavement and then slid. The victim had multiple bilateral rib fractures and lacerations to the liver, to the left pulmonary artery, into the left bronchus, and to the aorta. Dr. Mileusnic-Polchan said that the victim's spinal cord was transected around his fourth thoracic vertebra. The injury potentially was fatal due to "spinal shock." She opined that if the victim had survived, he would have been paralyzed.

Dr. Mileusnic-Polchan testified that a deep "stellate laceration" that went "all the way to the bone" was found on the left side of the victim's forehead. Underneath the laceration were a contusion to the victim's brain, a hemorrhage between the skull and the brain, and a hemorrhage to the surface of the brain. Dr. Mileusnic-Polchan said that no abrasions were around the laceration; therefore, the wound was apparently caused by contact with an object, not with the pavement. Dr. Mileusnic-Polchan said that the laceration itself was not fatal necessarily; however, the internal injuries to the brain caused by the impact eventually would have been fatal. Dr. Mileusnic-Polchan said that the impact to the victim's head led to an "atlanto-occipital dislocation," which she explained meant that the "joints between the head and the . . . cervical spinal cord [were] completely disjointed and removed from each other." She opined that the dislocation would have been fatal immediately. Toxicology testing revealed that no drugs or alcohol were in the victim's system.

Dr. Mileusnic-Polchan opined that the victim's injuries were consistent with an impact of greater than thirty miles per hour. In summary, she said that the victim's death was caused by multiple blunt force injuries.

Officer Dustin Cook testified that at the time of the incident, he was working with the Blount County Sheriff's Office. He was dispatched to the scene of the crash and arrived around 9:30 p.m. The sun was beginning to set, but it was not completely dark outside, and the streetlights in the area had just come on. Officer Cook opined that the area was lit "[f]airly well."

Officer Cook testified that two vehicles, a motorcycle and a maroon Mustang, were involved in the crash. The victim, who had been riding the motorcycle, was lying in the roadway and being treated by paramedics. The Appellant was sitting in the Mustang and appeared upset and distraught. Officer Cook requested that paramedics on the scene examine her, but she had no serious injuries. The Appellant said that "she just hit the motorcycle, that she didn't see him there." She asked for permission to smoke a cigarette, but Officer Cook said no because of the amount of gasoline and antifreeze in the area after the crash. The Appellant put a mint or a piece of gum in her mouth.

Officer Cook testified that the Appellant exited her vehicle and that he asked if she had been drinking. The Appellant said she had consumed two beers approximately four or five hours before the crash. Officer Cook said that he did not smell any alcohol on the Appellant, which he surmised could have been because of the overwhelming smell of gasoline and antifreeze. Officer Cook asked the Appellant to perform field sobriety tests, and she complied, performing "fairly well" but exhibiting a few clues of impairment. Officer Cook said that during the tests, the Appellant appeared to be on "an emotional rollercoaster," wavering between calmness and hysteria. After Officer Cook asked the Appellant if she would consent to a blood test, "she was adamant that she wanted a blood alcohol test." Officer Cook then took the Appellant to Blount Memorial Hospital to have her blood drawn. Before blood was taken, Officer Cook read the Appellant part of an implied consent form. He explained that he did not read the entire form because the Appellant was not under arrest and had said she wanted to give blood. The Appellant signed the implied consent form, agreeing to submit to the blood test.

On cross-examination, Officer Cook testified that when he first came into contact with the Appellant, she was hysterical, upset, and emotional. The Mustang appeared to have suffered "substantial damage," and Officer Cook could not open the driver's side door. He recalled that the Appellant repeatedly asked about the victim's welfare and stated, "I'm more worried about him than me." The Appellant said, "'I didn't see him. [The traffic light] was green.'" Officer Cook noticed nothing about the Appellant that led him to believe she was intoxicated.

Amy Farr testified that on June 14, 2007, she was a certified phlebotomist at Blount Memorial Hospital. Using a blood collection kit that had been supplied to the hospital by the TBI, she collected a sample of the Appellant's blood at 10:40 p.m.

Debbie DeGregorio testified by video deposition that in June 2007, she worked as a crime scene technician and evidence custodian for the Alcoa Police Department. At 9:16 a.m. on June 15, 2007, she removed the blood alcohol kit containing a sample of the Appellant's blood from the secured evidence locker, where the kit had been placed by Officer Cook. At 11:00 a.m. on June 18, 2007, DeGregorio took the kit to the TBI crime laboratory. DeGregorio said that the kit was sealed and that the seal did not appear broken.

On cross-examination, DeGregorio testified that between the time she removed the kit from the evidence locker and the time she took the kit to the TBI, it was kept in a refrigerator in the evidence locker room.

TBI Special Agent Forensic Scientist Stephanie Dotson testified that she tested the sample of the Appellant's blood and that the amount of ethyl alcohol in the blood sample was .15 gram percent. Agent Dotson said that the "legal limit for blood alcohol in

Tennessee" was .08 gram percent; accordingly, the amount of alcohol in the Appellant's blood was almost twice the legal limit.

On cross-examination, Agent Dotson acknowledged that mistakes could be made in testing, but she explained that the crime laboratory had

> checks and balances within our system to verify that the paperwork generated is correct, that the instrument was working correctly, that my calibration controls are reviewed by a second person. There's numerous procedures in place to catch any typographical errors or anything like that.

On redirect examination, Agent Dotson again asserted that a mistake was not likely "[b]ecause of the procedures that we have in place[.]" She said that she would have noticed if the sample had been tampered with or if it had been degraded. Additionally, she noted that the information written on the tubes of blood corresponded with the information on the request form filled out by the officer. She asserted that she did not know of the crime laboratory's having "a case of a mismatched or lost blood sample[.]"

Agent Dotson testified that in 2007, the TBI crime laboratory "had approximately three months['] worth of storage, which was in a refrigerator." She stated that the samples were routinely destroyed in order to free up storage space. According to TBI policy, a court order was required for the laboratory to preserve a blood sample for longer than three months; nonetheless, the laboratory would preserve the sample after a "request by phone until a court order is produced, just as a courtesy." She had never heard of an independent lab testing a sample and achieving results that were inconsistent with those reached by the crime laboratory.

Dr. Kenneth Emil Ferslew testified as an expert in forensic toxicology and pharmacology. He said that alcohol could have a deleterious effect on motor performance by changing or dulling attention, altering personality and perception, and affecting balance. He said that larger doses of alcohol resulted in a higher blood alcohol level and that "as the blood alcohol rises, you start seeing more and more impairment." Dr. Ferslew said that alcohol might have a greater effect on someone not used to consuming alcohol but that a person who consumed more often could develop a tolerance.

Dr. Ferslew testified that the Appellant's blood was drawn one hour and six minutes after the crash. By factoring in an "alcohol elimination rate," he opined that the Appellant's blood alcohol content at the time of the crash was .168. In order to achieve that blood alcohol content, the Appellant would have to consume at least 1.74 ounces of

alcohol, such as almost three twelve-ounce cans of beer, within approximately one hour of the crash.

Dr. Ferslew testified that a person with a blood alcohol content of .15 would have a loss of inhibitions, a weakening of willpower, a duller or distorted sensibility, and a lack of attention, all of which would impair the person's ability to operate a motor vehicle.

The first defense witness, Bobby Eugene Jones, Jr., testified as an expert in accident reconstruction. He said that the motorcycle was stopped or moving slowly when it was struck from behind by the Mustang. He calculated that the Mustang was traveling a minimum of 39 miles per hour to a maximum of 44 miles per hour.

Based upon the foregoing, the jury found the Appellant guilty of vehicular homicide by intoxication. The trial court imposed a sentence of ten years in the Tennessee Department of Correction. On appeal, the Appellant challenges the trial court's denial of her motions to suppress the results of a blood alcohol test, arguing that (1) the State did not have valid consent to obtain the sample and (2) her due process rights were violated by the destruction of the blood sample before she was able to have the sample tested.

## II. Analysis

Initially, we note that in reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

### A. Consent for Blood Test

Regarding whether the police had consent to obtain the blood sample, we note that both the Fourth Amendment to the United States Constitution and article I, section 7 of

the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." A "blood draw and its subsequent analysis are both subject to the constitutional limitations imposed by the Fourth Amendment." State v. Scarborough, 201 S.W.3d 607, 616 (Tenn. 2006).

Generally, a warrantless search is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). However, "one of the exceptions to the warrant requirement is a search conducted pursuant to consent." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973), and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." Jackson, 889 S.W.2d at 221. Whether consent exists and "'whether it was voluntarily given are questions of fact.'" State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983)). The prosecution bears the burden of proving that the Appellant freely and voluntarily gave consent. See McMahan, 650 S.W.2d at 386.

In the instant case, Officer Cook and Lieutenant Gilbert asked the Appellant to submit to a blood alcohol test. Specifically, Lieutenant Gilbert said to the Appellant, "Okay. When we have an accident of this magnitude with serious bodily injury we have to request that you take a blood alcohol test. Okay?" The Appellant responded either "[o]kay" or "[f]ine."

The Appellant argues that she did not give valid consent to have her blood drawn. She contends that she was coerced by Lieutenant Gilbert into giving a blood sample.[3] However, the trial court found that Lieutenant Gilbert requested that the Appellant submit to a blood test; he did not require her to submit to a blood test. The court also found that the Appellant sounded "eager to give blood." The court noted that the Appellant "arguably asked for a blood alcohol test" during the field sobriety tests when she asked Officer Cook, "'Why don't you just do an alcohol test?'" Finally, the court found that the Appellant signed the implied consent form even though she was not under arrest at the time. Based upon these facts, the court found that the Appellant knowingly, voluntarily, and intelligently consented to the blood test. Nothing in the record preponderates against these findings. Accordingly, we conclude that the trial court did not err by denying the Appellant's motion to suppress the results of the blood test.

## B. Destruction of Evidence

---

[3]In support of her contention, the Appellant cites Benjamin Tyler Case v. State, No. M2007-02173-CCA-R9-CO (Tenn. Crim. App. at Nashville, Aug. 26, 2008). However, the State, who was the appealing party in Case, applied for and received a voluntary dismissal of the appeal, and the opinion was withdrawn on March 18, 2010.

Next, we will address whether the blood test results should have been suppressed because the destruction of the blood sample prior to the Appellant's being indicted deprived her of the ability to have the sample independently tested. The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). Thus, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

In State v. Ferguson, 2 S.W.3d 912, 914 (Tenn. 1999), our supreme court addressed "the factors [that] should guide the determination of the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory." The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Ferguson, 2 S.W.3d at 917. "For this duty to arise, the [evidence] must be expected to play a significant role in [the Appellant's] defense." State v. Merriman, 410 S.W.3d 779, 792 (Tenn. 2013). "Specifically, [the evidence] must have potential exculpatory value and be of such a nature that [the Appellant] would be unable to obtain comparable evidence by other reasonably available means." Id.

If the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

Ferguson, 2 S.W.3d at 917 (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options such as dismissing the charges or providing an appropriate jury instruction. Id.

We can appreciate the Appellant's claim that the State had a duty to preserve the blood sample. Generally, "the State has a duty to preserve all evidence subject to

discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. Moreover, a blood sample taken from a defendant typically is subject to discovery under Tennessee Rule of Criminal Procedure 16(a)(1)(F). See State v. Gilbert, 751 S.W.2d 454, 460 (Tenn. Crim. App. 1988); see also Tenn. Code Ann. § 55-10-408(e) (providing that "[t]he person tested shall be entitled to have an additional sample of blood or urine procured and the resulting test performed by any medical laboratory of that person's own choosing and at that person's own expense"). However, "the State is not required to preserve samples taken for the limited purpose of determining the defendant's blood-alcohol level" in that "i[t] is common knowledge that human blood is perishable, and specimens of blood can only be maintained for a short period of time." State v. Jordan, 325 S.W.3d 1, 82 (Tenn. 2010) (appendix) (citing California v. Trombetta, 467 U.S. 479, 491 (1984)).

The issue regarding the preservation of samples in State v. Leath is quite similar to the issue in the instant case. In Leath, the defendant was accused of first degree premeditated murder for the death of her husband, who was shot above his left eye. 461 S.W.3d 73, 102 (Tenn. Crim. App 2013). The defendant claimed that the victim committed suicide, but the State's theory was that the defendant sedated the victim and shot him. Testing of the victim's blood revealed the presence of three drugs that would have made him unable to have gotten out of bed that morning and "'really out of it.'" Id. at 89. After the State indicted the defendant, she filed a motion to preserve the victim's blood and urine samples but learned they had been destroyed and filed a motion to exclude the test results. Id. at 97. The trial court held that the State had a duty to preserve the samples but refused to exclude the results "because the samples had been destroyed pursuant to TBI policy, the evidence was not necessary to establish an element of the indicted offense, and the Defendant had not 'challenged the sufficiency or accuracy of the TBI testing or procedures.'" Id.

On direct appeal of her conviction, this court first disagreed with the trial court's conclusion that the State had a duty to preserve the blood and urine samples, noting the perishability of such samples. Id. at 98 (citing State v. David Lynn Jordan, No. W2007-01272-CCA-R3-DD, 2009 WL 1607902, at *35 (Tenn. Crim. App. at Jackson, June 9, 2009), affirmed, (Tenn. 2010)). This court then explained as follows:

> Moreover, even if the State had a duty to preserve the samples, the Defendant "has failed to demonstrate that [her] right to a fair trial was affected by the destruction of the evidence." Jordan, 2009 WL 1607902, at *35.
>
> The State did not act in bad faith in destroying the samples, as they were destroyed in accordance with established TBI policy and long before the Defendant was

- 15 -

indicted in this case. Jordan, 2009 WL 1607902, at \*35 (stating that the "mere loss or destruction of evidence does not constitute bad faith"). There was no evidence that the samples were improperly collected or tampered with, and the chain of custody was established at trial. More importantly, the Defendant has not presented any evidence to question or doubt the accuracy of the TBI's analysis of the samples. As such, "it cannot be said that evidence critical to the defense was excluded." Id.

Id.

The Appellant argues that the "antiquated belief" regarding the inability to preserve blood evidence is belied by Agent Dotson's testimony. Granted, Dotson testified that human blood, if properly maintained, could be tested years later for blood alcohol content. However, she also stated that the blood alcohol level would decrease slightly over time. She further testified that in 2007, the TBI crime laboratory had the storage space to keep only about three months' worth of samples, meaning that all blood samples could not be stored for an indeterminate period by the laboratory. Thus, Dotson's testimony does not dissuade us from following the holdings in Jordan and Leath that the State had no duty to preserve the evidence.

In any event, the State destroyed the evidence in accordance with established TBI policy. Although the State destroyed the evidence prior to indicting the Appellant, we note that Dotson testified that the TBI's policy was to keep samples for a minimum of sixty days. The TBI did not destroy the Appellant's blood sample until November 2, 2007, well-beyond that sixty-day requirement. Furthermore, nothing indicates that the sample was improperly collected or tampered with; the Appellant stipulated at the suppression hearing to the chain of custody from the time the blood was drawn to the time it reached the TBI; and the Appellant adduced no evidence to contradict Dotson's testimony regarding the testing mechanisms and procedures employed by the TBI. Therefore, as in Leath, it cannot be said that evidence critical to the defense was excluded.

As to the Appellant's claim that she did not have notice that she needed to have the blood sample tested until she was indicted, the record belies that contention. The record reveals that defense counsel requested preservation of the blood sample approximately five months before the Appellant was indicted, demonstrating that she was clearly aware, long before formal charges were returned, that she could have the blood sample tested. Thus, we conclude that the Appellant is not entitled to relief.

- 16 -

### III.  Conclusion

Finding no error, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE