IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2025

**G'ANDRE FIELDS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County
Nos. 20-01334, 20-02001, 20-02002, 20-03089, 21-01070     James Jones, Jr., Judge**

_____

**No. W2024-01636-CCA-R3-PC**
_____

Petitioner, G'Andre Fields, appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in denying his claim that he received the ineffective assistance of counsel because trial counsel failed to file a motion to suppress Petitioner's DNA. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and STEVEN W. SWORD, JJ., joined.

Sharon Morales, Memphis, Tennessee, for the appellant, G'Andre Fields.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Rachel Moore and Devon Dennis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

Petitioner pled guilty in five separate cases to five counts of aggravated rape and one count of carjacking and received an effective twenty-year sentence. The facts of the cases set forth by the State at the guilty plea submission hearing are as follows:

> [Case no. 21-01070:] Had this case gone to trial, the State's proof would have shown on February 9, 2019, the victim . . . had created a profile on Loko Space. An unknown male contacted her and they agreed to meet up [and]

exchange $100 for sex. The victim did meet up with the male on Sycamore View Road here in Memphis, Shelby County.

At that [sic] time that they met up, the victim came and sat in the male's vehicle. The male began to slowly drive off and accelerated through a parking lot. He went to an abandoned area nearby, parked the vehicle, pulled a handgun out and demanded the victim take off her clothing. He forced penile vaginal sex on her at that time. He attempted to take her phone, but she had left her phone inside the hotel room. He demanded that she get out of [his] vehicle.

She did report this to Memphis police ("MPD"), did have a sexual assault kit taken. She had learned through Facebook apparently that the same male had been raping other women, which is how she reached out to MPD again. At that time she was shown a photo lineup and did identify him as the male who had raped her. Those events occurred here in Shelby County.

         . . . .

[Case no. 20-01334:] Had that case gone to trial, the proof would have shown that on September 27th of 2019, the victim in this case . . . was walking to the store when she was approached by a gold Neon driven by an unknown male black. She gave a description of him. She said that the Neon parked in front of her next to the sidewalk, the male got out of the vehicle with a small handgun, forced her into the backseat of the vehicle.

She said her head was in the car and [the] rest of her body was outside of the car. He told her to bend over and he forced penile vaginal sex on her. He then pointed the gun at her and told her to walk in the opposite direction. She did call police. A sexual assault kit was taken. And ultimately there was a CODIS[1] hit to [Petitioner] from that sexual assault kit.

And [Petitioner] did waive his *Miranda* rights, giving a statement denying ever knowing the victim in this case.

         . . . .

[Case no. 20-02002:] Had this case gone to trial, State's proof would have shown that on February 24, 2019, [MPD] responded to the 2800 block of Woodlawn Terrace where this victim . . . reported that she met someone she knew as Vaughn on the dating site ListCrawlers.

---

[1] Combined DNA Index System

This person picked the victim up, drove to an abandoned location, and told [the victim] to get in the backseat of his vehicle, at which time she heard the sound of a gun being cocked. She pled for her life. [Petitioner] told [the victim] to bend over and forced penile vaginal sex, as well as oral sex on the victim.

[Petitioner] at some point allowed the victim to leave but took her phone. She also went to Rape Crisis, did have a sexual assault kit. That kit did in March of 2000 hit to in [sic] the CODIS database to [Petitioner]. He[,] when questioned by MPD did waive his *Miranda* rights and denied knowing the victim . . . at that time. All those events occurred here in Shelby County.

. . . .

[Case no. 20-02001:] Had this case gone to trial, the State's proof would have been [that] on September 23, 2019, [MPD]l responded to the 3200 block of Jean. This victim . . . said she was walking to Krystal's when an unknown male driving a burgundy colored Nissan drove up next to her. She gave a description of the suspect at the time.

She said the vehicle drove up to her, she asked him if he wanted a date. The male said he only had $40. She got into the car with him. They drove to an abandoned parking lot next to a business, but when [the victim] got out of the vehicle, the male pulled out a pistol and (indiscernible) for money. He demanded she take off her clothes. He made her bend over and began beating her with the pistol more than six times. He did forcibly penetrate her vaginally.

She also went to Rape Crisis, had a sexual assault kit collected. In March of 2000 the male DNA profile from that kit hit in CODIS to [Petitioner]. He again waived his *Miranda* rights and denied to [MPD] that he knew that victim.

. . . .

[Case no. 20-03089:] Had this case gone to trial, State's proof would have shown that on August 22nd of 2019, [MPD] responded to a forcible rape at . . . Cromwell. On the scene they were met by the victim . . . who advised she had met a male who identified himself as Vaughn on ListCrawler. [The victim] advised that the male contacted her through text messages about smoking marijuana and having sex.

She advised that he gave her an address . . . and had her come pick him up. The victim said at ten o'clock at night she went to pick him up. Once on the scene he walked down the driveway, got [in]side of her vehicle which was a 2012 Kia Soul which she was renting at the time. She said that the male told her to drive until [they] pulled into a parking lot at Cromwell Elementary.

She said once parked, the male climbed in the back seat of the vehicle. She got in the back seat with him. They had previously agreed that they were going to exchange a certain amount of money for sex. However, when she began taking down her pants, she looked up and had a handgun pointed at her head. The male pointed the handgun, grabbed her hair, [and] told her she had to keep undressing. She started pleading for her life.

He began forcing penile anal sex on her. Then he went on to force penile vaginal sex on her and then forced her to perform penile oral sex.

Once finished, the ma[l]e forced her to get out of the car and he jumped into the driver's seat of her car and took off. Her phone and purse were still in the car at that time.

She ultimately knocked on some neighbor in the area's door who called 911. She was transported to Rape Crisis. She did receive a sexual assault kit. That kit - - the DNA results from that kit did come back in CODIS as a match to [Petitioner]. He was then placed in a lineup and that victim . . . positively identified him as the person who sexually assaulted her.

Again, [Petitioner] waived his *Miranda* rights and did give a statement to police. He was saying that he did not sexually assault this victim and that he would recognize anyone he had sex with.

All of those events occurred here in Shelby County[.]

Petitioner filed a timely pro se petition for post-conviction relief requesting DNA analysis, alleging that the DNA evidence in his case was illegally obtained because the affidavit to the search warrant contained reckless and false statements. Petitioner further alleged that although the affidavit reported that Petitioner's DNA was a match in the database, the Tennessee Bureau of Investigation ("TBI") confirmed that his DNA was not entered into the database until after the search warrant was issued. The post-conviction court entered an order appointing counsel and noting that Petitioner's pro se petition did not state a cause of action unless Petitioner "blames his attorney for these allegations." The court also entered an order compelling the TBI to produce all documents relating to their investigation. An amended petition was filed by counsel, and a hearing was held.

- 4 -

At the post-conviction hearing, trial counsel, who had been a criminal defense attorney for twenty-five years, testified that Petitioner's mother hired him to represent Petitioner on seven charges of rape and one charge of carjacking. He and Petitioner discussed the strengths and weaknesses of the cases which trial counsel noted "were all DNA hits." Trial counsel said:

> And so the - - the - - with it being a DNA hit, and I - - I remember we were having a little issue that we couldn't quite get to the - - an agreement that consent might be the only defense when there's DNA. He was - - he was very focused in on attacking the DNA.

Trial counsel testified that he could not have presented a consent defense without Petitioner agreeing to it because that is "potentially admitting to guilt." He agreed that there was another suspect in the "serial rapist cases."

Trial counsel testified that he and Petitioner discussed the plea negotiations but he could not specifically recall the State's initial offer. He said that Petitioner asked him to "address the prosecutors for the potential for a [ten] year and I did that." The State rejected the offer, and trial counsel suggested fifteen years, which was also rejected by the State. Trial counsel testified that the State made an offer of twenty years, which Petitioner rejected, and the case was set for trial. He said: "I remember the State was very adamant about giving him the absolute longest sentence they could because he had so many fresh new rape cases where they weren't going to have any problem finding the victims or having people come in and testify."

Trial counsel testified that prior to trial, he requested the trial court to enter a consent order "requesting provision to the defense of DNA related items in the possession of the State of Tennessee and/or the Tennessee Bureau of Investigation." He noted that "along with it is a list of things I'm requesting from TBI to get their policies and procedures and who tested it[.]" Trial counsel testified that he would have based his argument at trial as to whether the DNA was a match on the information he received from the consent order. Although he did not specifically recall, trial counsel assumed that he received the DNA information from the TBI.

Trial counsel agreed that another attorney handled Petitioner's case on the day of trial because that attorney "trie[d] most of our sex crimes because for some reason he has an amazing success record in front of a jury when it comes to sex crimes." He said that a plea agreement was reached on the day of trial, and he thought that it was in Petitioner's best interest to accept the plea offer.

Trial counsel agreed that all of Petitioner's cases "came down to DNA." He said that after the plea, Petitioner "brought to my attention that at the time he had DNA taken from him and it was tested into CODIS and matched in CODIS, that DNA in CODIS should have

been removed under the statute." This was because the DNA was in CODIS due to a case that had been dismissed or for which Petitioner received diversion; trial counsel could not remember which circumstance applied. Trial counsel testified:

> So when I got that information from [Petitioner], I immediately started researching it, and out of every court that's ever - - that I can find, every court that's reviewed this issue and there's none - - no case law in Tennessee, it's all other states, all found or held that leaving that sample of DNA in CODIS longer than it was allowed, I'm doing air quotes, allowed to be in CODIS is not a Fourth Amendment Issue, because it's not a search and it's not a seizure. It's an administrative regulatory statute that controls TBI and their maintenance of their data and so it doesn't - - doesn't rise to any Fourth Amendment challenge. And in reading those cases, I absolutely agreed with the - - with the reasoning. I thought it was - - it was consistent across all states that had raised it, and it was very well - - and it was accurate to what a Fourth Amendment violation would be.

> Fourth Amend - - Fourth Amendment protects [Petitioner] from unreasonable searches and seizures. It doesn't have anything to do with DNA sitting in a CODIS databank so - - and in the cases that it got far - - farther than that, those states had a provision in the statute that gave a remedy to a defendant if his DNA was left in the database longer and they were all civil penalty, like a hundred bucks. We leave it in there too long, we'll give you a hundred bucks. It was never suppression. So I looked at Tennessee's, and Tennessee's has no remedy if the State is negligent in removing it in a timely fashion. Again, it's - - it's - - air quotes, sorry, I hate doing that on the record, air quotes, timely, whatever that means. There's a - - there's a time in the [Tennessee Code Annotated], but there's absolutely no remedy, and as - - as we learned in law school, a right without a remedy's not a right. You have to have a right and a remedy.

Trial counsel also noted that his research revealed that a "CODIS hit" has "no evidentiary value" and that "you have to verify this to - - in order to ensure the DNA's actually the person." He did not feel that he had any "good faith basis" for a suppression motion in Petitioner's case, and he could not find any case law to support filing the motion based on the DNA. Trial counsel did not believe he would have been successful had he filed a suppression motion.

Trial counsel did not recall if he spoke with anyone at the TBI about removing Petitioner's DNA from the CODIS database. He thought that he might have received something from the TBI admitting to their mistake, but he was not one "hundred percent certain[.]" Trial counsel also did not recall if the original "CODIS hit" came back before Petitioner gave his DNA pursuant to a warrant. He agreed that Petitioner would not have

been indicted in any of the cases without the DNA evidence. He noted that there were some issues with identification, "so that's why the DNA was so strong." Trial counsel agreed that Petitioner accepted the plea offer when he learned that the State was going to use the DNA evidence against him.

Charles Hardy of the TBI CODIS unit explained the purpose of the unit as follows:

The CODIS Unit is responsible for maintaining all of the DNA that is collected in the State, be they arrestee sample or offender samples. When those samples come in and they're processed by our technicians, we actually send them out to a private laboratory that will generate the DNA profiles for those samples. The data is sent back to the bureau, and myself or two other scientists in the unit actually do a 100 percent review of the data prior to entering it into the database. We will actually generate DNA profiles when there is a match in the system, and we have to go pull a sample to verify that the DNA profile on that swab actually matches what's in the database.

Agent Hardy agreed that an arrestee's DNA sample is collected for certain violent offenses pursuant to Tennessee Code Annotated section 40-35-321(E). The violent offenses include aggravated assault and aggravated rape. Agent Hardy testified that in this case; the [MPD] requested that the TBI run a DNA sample through the CODIS database as a potential match for a specific suspect in a rape case. However, the database indicated that the DNA sample matched Petitioner's DNA from an aggravated assault case, and the match was verified by the TBI reviewing process.

Concerning the TBI expungement process for CODIS, Agent Hardy testified that there is a checklist. He said that court clerks across the state are statutorily required to submit the "final dispositions of any arresting charges." TBI technicians then review the records they receive and match the name on the list, the arrest date, the charge, and verify whether the DNA sample "goes with that disposition." Once a DNA sample is matched to a particular individual, the TBI technician looks at the final disposition of the charge. Agent Hardy testified that for example: if the individual's DNA was collected because of an arrest for aggravated assault but the final disposition was for simple assault, a non-qualifying offense to collect DNA, the technician would mark an "E" on the form to indicate that the DNA should be "expunged." After that, the technicians go back to samples marked with an E and expunge the DNA profiles from the TBI SQL database. The DNA profiles are then deleted from the CODIS database.

Agent Hardy noted that "most of the court clerks are good about sending us the information we need." He said that most of the larger counties send them violent offender reports which are "pages and pages" long and that Shelby County sends their violent offender reports as an Excel spreadsheet. He noted that it "takes longer to go through all of those." Concerning the present case, Agent Hardy testified:

In this case, it was a little different. There was a record expungement that went to the CJIS Division, so our Criminal Justice Information System, which is across - - it's on the other side of the building from us. Our two units don't talk.

So criminal records can get expunged, but if we don't know, we don't expunge the DNA profile. Same thing could have happen[ed] with, you know, any - - well, it can happen if charges should have been - - or were dropped and the clerk's office didn't tell us about it. Same - - same situation, should have been expunged, it wasn't because we didn't know. So if we don't know, we can't expunge it.

Agent Hardy did not know why the record expungement order was sent to the CJIS Division rather than the CODIS Division. Agent Hardy identified a letter from the TBI to Petitioner which indicated that an expungement order was received by the TBI on February 19, 2020, and that Petitioner's DNA was expunged from CODIS on February 26, 2020. Agent Hardy agreed that according to the letter, it would have been error if Petitioner's DNA was still present in the CODIS database in April of 2020.

On cross-examination, Agent Hardy said that he "would not be surprised to find that this was not the only case where someone's records were expunged, but we didn't know to expunge the DNA sample[.]" He said that a new buccal swab was collected from Petitioner after the presumptive match in April of 2020.

Upon questioning by the post-conviction court, Agent Hardy testified that one individual could have "multiple database samples" in the system. He explained that if one case resulted in expungement, but the individual had ten other samples in the system, those other samples would remain there. Agent Hardy further testified: "But a case expunged in itself doesn't necessarily mean that the database sample would be expunged, if we didn't know about it."

Petitioner testified that he met with trial counsel once, and after that they mainly communicated by letter about plea deals. He noted that the "main thing was the DNA so [trial counsel] said he would look into it." Petitioner testified that he never heard anything about the investigation and did not know that his case was set for trial until a week before trial. He said that he continually told trial counsel that the DNA did not belong to him and that there was "something was wrong with this DNA." He also said that the charge related to the DNA had been dismissed. Petitioner testified that trial counsel was going to investigate the matter but "he never said anything else about it. He just made it look like I was going to lose." He said that trial counsel "told me I need to sign."

Petitioner explained that he was charged with aggravated assault in December 2019, and his DNA had been collected. According to Petitioner, after the charge was quickly

dismissed, he submitted an order to have the charge expunged, which was granted, and there were no other violent offenses on his record. Petitioner said there was no other reason for his DNA to be in the CODIS system after that. He claimed that after his first conversation with trial counsel, trial counsel got "pissed off completely" each time that he mentioned the DNA.

Petitioner testified that he again mentioned the DNA to trial counsel after Petitioner received discovery and saw that the DNA match came from the aggravated assault charge that had been expunged. He said that he told trial counsel from their first meeting that his DNA should not have been in the CODIS system.

Petitioner pled guilty to the aggravated rape and carjacking charges on October 25, 2021. He testified that he entered the plea because trial counsel and co-counsel told him that he needed to consider accepting the twenty-year offer. Petitioner initially rejected the offer, but on October 25, trial counsel and co-counsel said that if Petitioner did not accept the offer, he was "fixing to be going to trial in an hour." Petitioner claimed that trial counsel told him that co-counsel would represent Petitioner at trial, and Petitioner did not understand how co-counsel was going to represent him when Petitioner's mother had hired trial counsel. Petitioner testified that he and trial counsel never discussed trial strategy. He felt that trial counsel never helped him "at all," and he had exhausted all of his "resources."

On cross-examination, Petitioner testified that he mentioned the DNA evidence to trial counsel at their first meeting, and he mentioned it every time that he spoke with trial counsel but "it would get shot down quick." He said that the DNA evidence in his cases did not belong to him and that the TBI was not "supposed to test it at the same time." Petitioner said that trial counsel was forcing him into trial with false DNA, and he "didn't want to go to trial like that." Therefore, he pled guilty.

Petitioner agreed that at the guilty plea submission hearing, he told the trial judge that there was nothing he was confused about or did not understand and that trial counsel had explained everything to him. He did not mention anything about the DNA evidence to the trial judge because "its nothing pretty much he could have [done]." Petitioner agreed that he told the trial judge he was satisfied that his attorneys did everything they could for him and that his guilty pleas were freely and voluntarily entered.

Alyssa Henning of the Shelby County District Attorney General's Office was previously assigned to the Special Victim's Unit and was the primary prosecutor for all of Petitioner's cases. She provided discovery to trial counsel for all of Petitioner's cases, and she later provided him with additional discovery, including videos and recordings of jail calls. Ms. Henning did not recall her discussion with trial counsel about DNA. She said, "I know as we got closer to trial, we talked a lot about the jail calls and potential 404B that was coming in." Concerning the jail calls, Ms. Henning testified:

So there were several jail calls that had occurred when [Petitioner] was initially charged down in general sessions. He wasn't charged with all of the cases, but there was this initial charge that hit, and [Petitioner] was speaking on the telephone to either a girlfriend or a friend, I can't remember specifically, I'd have to look in the file, but essentially telling this person to go bribe this victim who - - who he thought was the victim to not come to court. The problem was, it wasn't the victim. So we had this situation where this rape that has not yet been charged out, he's trying to go tell this victim not to come to court, but that's not even the alleged victim in this case. So obviously, that was, you know, very inculpatory evidence. That - - there was a motion that was filed. We had a full hearing on it. You know, [trial counsel] argued that it shouldn't come in. Judge Carter eventually ruled that it could in fact come in, and that's kind of the posture we were in before trial.

Ms. Henning testified that she was prepared for trial, and the victim for that case was "cooperative." She said that trial counsel spoke with Petitioner prior to the plea agreement, and she noted that both trial counsel and co-counsel were very involved in plea negotiations. She did not recall if trial counsel mentioned filing a motion to suppress the DNA evidence. Ms. Henning said that the guilty plea was "extensive," and Petitioner indicated during the plea hearing that he wanted to plead guilty and that he was satisfied with the representation of his attorneys.

In its order denying post-conviction relief concerning trial counsel's failure to file a motion to suppress his DNA, the post-conviction court accredited trial counsel's testimony that he discussed the suppression issue with Petitioner. Trial counsel also researched the matter and found that "based off his research, that there was no legitimate basis to pursue this topic and that this information was communicated to [Petitioner]." The post-conviction court further found that "[d]espite the research, [P]etitioner continued to reject trial counsel's advice and wanted to continue challenging the DNA instead of preparing for trial." Therefore, the post-conviction court concluded that "trial counsel's decision was a tactical choice informed based on adequate preparation."

The post-conviction court also found that even if trial counsel's decision were not tactical, Petitioner failed to prove that the motion to suppress would have been granted and that there was a reasonable probability that the "proceeding would have concluded differently if the motion to suppress had been filed." The post-conviction court further concluded:

The [P]etitioner presented the case, *Maryland v. King*, 569 U.S. 435 (2013) for the [c]ourt's review, in support of its position that the motion to suppress would have been successful. After review of the case, the [c]ourt finds that this case is distinguishable to the case at bar. In *King*, the issue was whether a DNA swab and its inclusion in a CODIS database was a Fourth Amendment

violation. The [c]ourt held, that it is constitutionally reasonable for the [S]tate to undertake the physical intrusion of swabbing the inside of the legitimately detained arrestee's cheeks due to the intrusion being negligible and benefit of using limited data from the DNA to determine whether the individual might be associated with the crime scene or victim.

Petitioner presented an agent from the TBI, Charles Hardy, who testified to the procedure of storage of the DNA that is collected from defendants. Agent Hardy testified that one department is in charge of the storage and another department is in charge of removing the DNA if cases are disposed and/or expunged. He testified that he is not sure why the [P]etitioner's DNA was not removed but that the two (2) departments do not necessarily communicate directly with each other. It does appear that the case that allowed for the collection of DNA was dismissed and even expunged, which generally starts a departmental mechanism for the removal of the DNA sample. However, in this case, the mechanism did not occur and the sample remained in the CODIS database. It appears that another consideration in [the] *King* case was that the [d]efendant did not request that his DNA be removed from the database until after the match occurred. It appears that had this request taken place prior to the match and the request not complied with, that the ruling could have possibly been different. It appears that in this case, like in the case of *King*, the [P]etitioner did not make a formal request to have his DNA removed from the CODIS system until after a match occurred. However, despite this analysis, the [c]ourt finds that trial counsel has adequately researched this issue and determined after such investigation that the motion was without merit. Trial counsel's decision not to pursue this issue appears . . . not only based off his research but was a calculated strategic decision, one this [c]ourt finds to have been a reasonable decision based on the information and experience of the attorney.

It is from this ruling that Petitioner now appeals.

**Analysis**

On appeal, Petitioner claims the post-conviction court erred in denying him relief on his claim of ineffective assistance of counsel. He argues that trial counsel was ineffective by failing to file a motion to suppress his DNA. The State responds that Petitioner failed to show that counsel was ineffective because Petitioner's DNA was lawfully collected pursuant to statute, and even though the DNA should have been deleted from the TBI database, it did not invalidate Petitioner's convictions. We agree with the State.

- 11 -

Under the Post-Conviction Procedure Act, a criminal defendant may seek relief from a conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. Because the right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee, the denial of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020).

"Appellate review of an ineffective assistance of counsel claim is a mixed question of law and fact that this Court reviews de novo." *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)). As an appellate court, we are bound by the factual findings of the post-conviction court unless the evidence in the record preponderates against those findings. *Howard*, 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Fields v. State*, 40 S.W.3d 450, 456 n.4 (Tenn. 2001). The same does not hold true for the post-conviction court's conclusions of law which are reviewed de novo with no presumption of correctness. *Howard*, 604 S.W.3d at 57; *Holland v. State*, 610 S.W.3d 450, 455 (Tenn. 2020).

When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Deficient performance is representation that falls below "an objective standard of reasonableness" as measured by prevailing professional norms. *Kendrick*, 454 S.W.3d at 457 (quoting *Strickland*, 466 U.S. at 688); *see also Baxter v. Rose*, 523 S.W.2d 930, 932-33 (Tenn. 1975). Under *Strickland*, this court starts with "the strong presumption" that counsel exercised reasonable judgment in all significant decisions. *Kendrick*, 454 S.W.3d at 458 (citing *Strickland*, 466 U.S. at 689).

To show prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Kendrick*, 454 S.W.3d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reasonable probability is a lesser burden of proof than preponderance of the evidence. *Kendrick*, 454 S.W.3d at 458 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). When the proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice); *McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011

- 12 -

WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of evidence at trial).

Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697; *Nesbit v. State*, 452 S.W.3d 779, 786-87 (Tenn. 2014). Accordingly, if either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). "[T]he petitioner is required to prove the fact of counsel's alleged error by clear and convincing evidence." *Phillips*, 647 S.W.3d at 401 (quoting *Dellinger*, 279 S.W.3d at 294); *see also* T.C.A. § 40-30-110(f); Tenn. Sup. Ct. 28, § 8(D)(1).

In this case, the record supports the post-conviction court's findings that trial counsel did not render deficient performance by not filing a motion to suppress the DNA evidence. Moreover, we cannot conclude that Petitioner has demonstrated any prejudice by trial counsel's failure to file a suppression motion. Trial counsel testified that he researched the DNA issue and found that there was no case law in Tennessee on the issue and that courts in all other states held that "leaving the sample of DNA in CODIS longer than it was allowed" was "not a Fourth Amendment Issue, because it's not a search and it's not a seizure." He further noted that "[i]t's an administrative regulatory statute that controls TBI and their maintenance of their data and so it doesn't - - doesn't rise to any Fourth Amendment challenge." Trial counsel testified that any state which had a statutory provision to offer a remedy to a defendant whose DNA was left in the database for too long consisted of a civil penalty. He researched Tennessee law and found no remedy if the State is negligent in removing DNA in a timely fashion.

Agent Hardy testified that although there was an expungement order in Petitioner's case and that his DNA should have been removed from the CODIS database, the order was sent to the wrong division of the TBI, and the CODIS Unit did not know to remove Petitioner's sample from the database. He noted that their "database samples do not have a chain of custody so they cannot be considered evidence."

Tennessee Code Annotated section 40-35-321(e)(1) provides: "When a person is arrested on or after January 1, 2008, for the commission of a violent felony as defined in subsection (e)(3), the person shall have a biological specimen taken for the purpose of DNA analysis to determine identification characteristics specific to the person." The Tennessee Supreme Court has addressed the portion of the statute requiring a defendant to contribute DNA and found that it is a reasonable search that does not violate the Fourth Amendment. *State v. Scarborough*, 201 S.W.3d 607, 625 (Tenn. 2006). Additionally, the United States Supeme Court has held that a statute which requires a DNA sample to be taken from a person arrested for a violent felony does not violate the Fourth Amendment. *King*, 569 U.S. at 450-56, 465-66.

In this case, Petitioner's DNA sample was initially properly taken after his arrest in an unrelated case for aggravated assault, a qualifying felony under the statute. It should have been removed from the CODIS database after his conviction was expunged. T.C.A. § 40-35-321(e)(3)(C), (e)(2). However, the failure to remove Petitioner's DNA from the CODIS database does not invalidate his convictions in this case because Tennessee Code Annotated section 38-6-113(c)(1) contains a "savings statute" which provides: "The detention, arrest or conviction of a person based upon a databank match or database information is not invalidated, if it is later determined that the specimens or samples were obtained or placed in the database by mistake." In *State v. Scott*, No. W2011-00677-CCA-R3-CD, 2012 WL 1656774, at *11 (Tenn. Crim. App. May 10, 2012), a panel of this court concluded that it was not necessary to determine whether the trial court in that case was correct in finding that the defendant's DNA was properly retained in the CODIS database "as he was a convicted felon because Tennessee Code Annotated section 38-6-113(c)(1) is clear that any erroneous obtaining or placing in the database does not invalidate the defendant's arrest and conviction based on such databank match." *Id.* at *11.

Based on the above reasoning, Petitioner cannot show that trial counsel was ineffective for failing to file a motion to suppress the DNA evidence. Moreover, he cannot show any prejudice because there is nothing to suggest that a motion to suppress would have been granted even had trial counsel filed one, and he has not alleged that he would have gone to trial had trial counsel filed the motion. Petitioner merely alleges that the filing of a suppression motion would have changed the outcome of the proceedings. *Hill v. Lockhart*, 474 U.S. 52, 59.

Petitioner has failed to prove his claim by clear and convincing evidence, and he is not entitled to post-conviction relief.

**CONCLUSION**

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

s/ *Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE

- 14 -