IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 12, 2025 Session

**STATE OF TENNESSEE v. MOHAMED MIRAY**

**Appeal from the Circuit Court for Bedford County**
**No. 2CC1-2023-CR-19524        Forest A. Durard, Jr., Judge**

_____

**No. M2024-01687-CCA-R3-CD**
_____

Mohamed Miray, Defendant, was indicted for and convicted of first degree murder. He was sentenced to life in prison. Defendant was identified and charged in part based upon a match to DNA found at the scene of the murder. Prior to trial, Defendant filed a motion to suppress in which he argued that his DNA was not properly in the Combined DNA Index System ("CODIS") because he was acquitted of a charge for which he was required to give a DNA sample when arrested and that his DNA should have been removed from the database as a result of the acquittal. The trial court denied the motion to suppress. Defendant was convicted by a jury and filed a motion for new trial. The trial court denied the motion for new trial, and this appeal followed. On appeal, Defendant challenges the trial court's ruling on the motion to suppress and the sufficiency of the evidence. After a review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jonathan W. Turner, Franklin, Tennessee (on appeal); Donna Hargrove, District Public Defender; Michael Collins and James Tucker, Assistant Public Defenders (at trial), Shelbyville, Tennessee, for the appellant, Mohamed Miray.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Robert Carter, District Attorney General; and Mike Randles and Lisa Zavogiannis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Rafael Mendoza-Pineda, the victim, was shot and killed outside his apartment in Shelbyville on August 26, 2022. The victim was forty-three years old, had three children ranging in age from ten to twenty-five and was employed as a butcher at Lucy's Market in Nashville at the time of his death. Prior to taking the job at Lucy's Market, the victim worked as a butcher at Ibex Market in Nashville, owned by Ashenafe Atlaw.

The victim lived at Davis Estates apartments in Shelbyville. The victim was shot eleven times; four of the shots in and of themselves would have been fatal. According to the medical examiner, victim's cause of death was multiple gunshot wounds, and the manner of death was homicide.

Chris Vest, employed as a Sergeant with the Shelbyville Police Department on the night of August 26, was working the "Celebration as a[n] extra patrol" at the "horse show grounds" when he received a report of a 911 call around 10:25 p.m. The 911 call reported an incident at Davis Estates and referenced "[two] males running through the parking lot, one had a gun chasing the other one." Because he was only about one mile away from that location, Sergeant Vest arrived at Davis Estates "[w]ithin a minute or so" of receiving the call. He parked his patrol car in front of "B building." As he got out of his car, a male bystander told him "that the person who got shot is right there," pointing to "the breezeway" at B Building. As Sergeant Vest approached B building, he saw a "gentleman that was l[]ying on the ground . . . in the foyer as you walk in that front door." The victim was "face down[,]" and there was a "large amount" of blood on the floor. Sergeant Vest "hollered at the guy to see if he could respond." Hearing no response, he turned around and "walked back out the door." Another officer, Bailee Dineen, arrived on the scene. Because she was wearing gloves, Officer Dineen "checked [the victim's] carotid artery to make sure he had no pulse." There was no pulse, and Officer Dineen noticed what looked like a "gunshot wound behind [the victim's] ear." The victim did not have any identification, so Officer Dineen "ran the tags of every vehicle in the parking lot in front of that B Building." The search revealed "vehicles registered to an individual named Rafael Mendoze-Pineda," who also lived at the building. Officers obtained a telephone number for the suspected victim and called the number. A cell phone "outside of the apartment building" rang. The cell phone was on the "back patio" of an apartment near the foyer next to a "pack of cigarettes on a chair." Officers later discovered that the cell phone belonging to the victim and the cigarettes were on the victim's patio.

Several other officers, including Officer Andrew Le Roy and Officer Dylan Bliss arrived on the scene, helped to establish a perimeter, and secured the area with caution tape. Officer Le Roy explained that the Criminal Investigation Division ("CID") was ultimately responsible for processing the scene but that he started a Crime Scene Log as part of his duties and spoke with two potential witnesses, Mark Rourke and Adam Morgan.

Based on a description provided by a witness, Sergeant Vest started looking for two "white" men, one of whom was described as wearing a bandana and a hat.  Sergeant Vest found a "straw hat l[]ying on the ground close to the tree" near the corner of B building.

As Officer Le Roy surveyed the scene, he noticed "[two] footprints in the dew on the grass" next to the straw hat.  He followed the footprints "to the entrance of the apartment complex around that apartment building."  The footprints appeared to be going toward Anthony Lane.

Mr. Rourke lived in an apartment on the bottom floor of the B building on the day of the incident.  The complex was made up of several separate buildings.  Mr. Rourke knew the victim in part because their apartments shared a wall.  Mr. Rourke had known the victim for about eight months and they spoke occasionally.

The night of the victim's death, Mr. Rourke was watching television at around 10:15 to 10:30 p.m. with his "glass door [] open, but [] [the] screen door closed."  "[S]udden[ly,]" he "could hear like somebody running really hard and you could hear footsteps.  And about that time I noticed one person run by [] wearing [what he thought was a] white like muscle shirt and pair of shorts" and "flip flops or something like that."  He heard "another set of footsteps running real hard" and a "person behind the number one guy with his hand out [fully extended] and I had actually heard one shot, when all of a sudden I also saw the flash from the muzzle of a gun."  At first, Mr. Rourke did not recognize the first person he saw run past.  He eventually figured out it was the victim.  The person following the victim was "maybe a couple of feet" behind the victim and was wearing what looked like "jeans . . . a flannel shirt, had like a bandana type thing across his face like covering his nose, and wearing like a straw hat."  Mr. Rourke could not tell if the person following the victim was wearing glasses and could not tell if the person was a male or female.  Mr. Rourke never saw a weapon but "saw the hand raised" and heard the shot and saw the flash from a muzzle.  Mr. Rourke heard the first shot and then "within seconds" he heard "like 3, maybe 4 more" shots.  When he heard the first shot, he "immediately jumped up and started to run back toward the hallway where [his] wife and daughter [were] and grabbed [his] cell phone out of [his] pocket and called 911."

After the shooting, Mr. Rourke discovered "bullets and bullet holes" in the area "underneath the red awning" and "[two] more on the second door as you go inside.  And then none back on the back wall."

Mr. Morgan also lived at Davis Estates, but he lived on the first floor of C building.  He was in his bedroom when he heard what he thought were gunshots.  When Mr. Morgan "looked out the window" he saw "a figure running from . . . the direction of the parking lot

towards the trees and sort of the open space on the other side of the apartments." He called 911. Mr. Morgan could not describe either person.

In processing the crime scene, officers found seven casings and three bullet fragments. Later, an additional bullet fragment was located under the victim's body. All the cartridge cases were identified as .40 caliber Smith & Wesson cartridge cases that were most likely fired through the same gun. Police did not recover a weapon.

The parties stipulated that Blue Star Services is a trucking company based in Hanover Park, Illinois, specializing in long-haul transportation services. Blue Star Services employed Defendant as an independent, over-the-road truck driver from December of 2021 to early September of 2022. He was assigned a white 2017 Volvo Tractor semi-truck with the unit number B-251 that was equipped with a GPS tracking receiver in proper working order. The data from the GPS receiver was saved on a computer using Omni Tracs Software, which saved location, latitude and longitude, speed, direction of travel, odometer readings, status of the ignition, date, and time in a Vehicle Position History Report. The company prohibited employees from loaning their trucks to anyone, and there were no reports that Defendant's truck was out of Defendant's physical custody or control.

Multiple businesses in the downtown Shelbyville area as well as traffic cameras recorded the movement of Defendant's truck through Shelbyville on August 26, 2022, the night of the victim's death. As part of the investigation, Detective Sergeant Sam Jacobs used the GPS information from the truck as well as the video recordings from traffic cameras and various businesses around Shelbyville to prepare a sequential timeline of the truck leaving Defendant's home in Nashville, entering Shelbyville, going to Davis Estates, and then leaving Shelbyville and returning to Nashville. The truck started at Defendant's home in Antioch, when its ignition was turned on at 8:10 p.m. At 8:15 p.m., the truck moved east at fifteen miles per hour on Bell Road in Antioch. The truck traveled down I-24 toward Shelbyville and exited the interstate at Highway 231. By 9:10 p.m., the truck was in the city limits of Shelbyville on Highway 231, also known as North Main Street. By 9:40 p.m., the truck drove through Shelbyville and parked at Davis Estates. The ignition on the truck was turned off and the driver's side door opened. A vehicle other than the Defendant's truck left Davis Estates at 10:14 p.m. At 10:26 p.m., the ignition of the truck turned on and the truck left Davis Estates. At 10:27 p.m., a 911 call reported the shooting. By 10:41 p.m., the truck headed out of Shelbyville on Highway 231. The truck continued to I-24 and traveled back toward Nashville. At 11:33 p.m., the truck turned off Bell Road onto Hickory Hollow Parkway. The truck pulled into a parking lot. The ignition was on, but the truck speed was zero. At 12:07 a.m., the truck was turned off. The truck was in a shopping center with a Chase Bank where Defendant had multiple accounts. The truck remained in that location until August 30th at 8:33 p.m. when the ignition was turned on. The truck went through Kentucky, Illinois, and Wisconsin and before eventually making

its way back to Tennessee. The truck was parked at Defendant's home on September 4 at 8:59 p.m.

Tennessee Bureau of Investigation ("TBI") Special Agent Lisa Forester testified as an expert in DNA. She explained that CODIS is a database that contains the known DNA of some individuals. Agent Forester tested the hat that was found at the scene as well as a pack of cigarettes, a cup, seven fired cartridges cases, and a blood sample from the victim. The testing of the hat revealed a DNA profile that was a mixture of at least two individuals, including at least one male. One of the major contributors of DNA was an unknown male. That unknown profile was entered into the CODIS database. A match was developed. TBI worked to verify the match, and TBI contacted the individual, collected a buccal swab from the individual, and submitted it to the lab for comparison. According to Agent Forester, the "unknown profile from the headband area of the hat" was compared "to the profile that was developed from the buccal swabs submitted" and "the major contributor" matched Defendant's DNA. She further explained that the "probability of randomly selecting a random unrelated individual with the same DNA profile as that major contributor would be one in a number greater than the current world population." Agent Forester examined the cartridge cases and could not find DNA sufficient for a profile comparison.

As a result of the DNA test results, Detective Sergeant Jacobs focused the investigation on Defendant. Officers issued a subpoena for cell phone records from Defendant's cell phone and bank records on Defendant's bank accounts. Bank records from Bank of America showed a Zelle transfer[1] of $2000 from Mr. Atlaw's[2] account to Defendant's account at Chase Bank on August 29, 2022. Defendant spent $7.50 at Ibex Market on July 12. Records from Defendant's cell phone confirmed that he had his truck on the day prior to the incident and searched the internet for Shelbyville news on August 30, pulling up the website for an article entitled, "Man Shot, Killed Outside of Apartment." Defendant's cell phone was either turned off or not connected to the network between 8:08 p.m. and 11:53 p.m. on August 26.

Defendant did not testify or present any evidence. The jury found him guilty of first degree murder, and he was sentenced to life in prison. After the denial of a motion for new trial, this appeal followed.

*Analysis*
*Motion to Suppress*

---

[1] A bank representative explained that a Zelle transfer is an instant transfer of money from one account to another by using an email address or mobile phone number.

[2] Mr. Atlaw was the victim's prior employer at Ibex Market.

On appeal, Defendant argues that the trial court erred in denying the motion to suppress the DNA evidence. Specifically, Defendant argues that Tennessee had "no statutory or constitutional right to access" his DNA because his DNA should have been destroyed after his acquittal in 2012 and, therefore, the State should not have been able to match his DNA to the DNA found on the hat at the scene. As a result, Defendant argues that any evidence obtained about his identity after the DNA match should be suppressed. The State disagrees and argues that the trial court properly applied the saving statute found at Tennessee Code Annotated section 38-6-113 to deny the motion to suppress, and even if Defendant's DNA should have been purged from the database, the good-faith exception to the exclusionary rule applies.

Prior to trial, Defendant filed a motion to suppress the DNA evidence and a motion to dismiss the indictment. In the motion and at the hearing, Defendant acknowledged that his DNA was in CODIS because he was arrested and charged with attempted aggravated robbery in 2012, a violent felony, but the jury acquitted him.[3] Defendant insisted that his DNA should have been expunged from the database after the acquittal. Defendant admitted that he was later charged with aggravated assault and interference with a 911 call, which would have required him to give a DNA sample but that the State dismissed those charges in 2017. Defendant acknowledged that those charges were reinstated to effectuate an arrest in this case.

The State agreed that Defendant was acquitted of attempted aggravated robbery in 2012 but asserted that Defendant's DNA remained in the CODIS database because the TBI was never notified of the acquittal. The State argued that Defendant also had other triggering violent felony arrests that required a DNA sample to be submitted to the CODIS database. The record demonstrated that Defendant was charged with aggravated assault in 2017, and aggravated burglary and aggravated assault in 2021. Finally, the State insisted that the saving statute, Tennessee Code Annotated section 38-6-113, renders any error in retaining his DNA harmless.

Fred Holloway, an investigator with the Public Defender's Office, testified at the hearing. He ran a background check on Defendant that revealed "[n]o felony convictions." Defendant had a charge for aggravated assault, which he referred to as a "carjacking" in 2009. That case went to trial in 2012, and Defendant was found not guilty of the felony but guilty of misdemeanor evading arrest.

---

[3] The parties both refer to this charge as carjacking. From the record, it appears that Defendant was originally charged with carjacking but the record reflects that Defendant was eventually indicted for attempted aggravated robbery.

Detective Sergeant Jacobs testified that he obtained a search warrant on June 25, 2022, to get a DNA sample from Defendant to compare with the DNA that was collected at the scene.

TBI Special Agent Charles Hardy testified that he worked in the CODIS Unit. His unit received the DNA profile from the hat found at the scene. The DNA profile was submitted to the database, and the sample matched a "known individual" identified as an "arrestee sample from 2009" from Defendant for the charge of "carjacking." Agent Hardy testified that the TBI never received a notification about the disposition of the 2009 case. He explained that a sample remains in the database until the "TBI gets notification from the Court Clerk's Office of the final disposition" of a case. Agent Hardy looked at the records the State maintains to see if any other arresting offenses would have required DNA collection and found "a couple" that were after the "carjacking" charge in 2009. Agent Hardy noted that the only sample they had in the database for Defendant was from the 2009 arrest. The Criminal Justice Information Services ("CJIS") report on Defendant was entered as an exhibit to the hearing. The CJIS report reflected that Defendant was acquitted of attempted aggravated robbery in 2012, charged with aggravated assault in 2017, and charged with aggravated burglary and aggravated assault via strangulation in 2021. While there were other charges, these specific offenses for which Defendant was arrested in 2017 and 2021 were violent offenses that would have required a DNA sample by statute.

The trial court denied the motion to suppress the DNA evidence and the motion to dismiss the indictment. The trial court determined Defendant's DNA was properly taken when he was originally charged in 2009. While the clerk should have notified the TBI to destroy the sample when Defendant was acquitted, the clerk failed to do so. However, the trial court noted Defendant's subsequent arrest for aggravated assault would have required Defendant to give a DNA sample. The trial court found that the case was still pending at the time of the present case and, even if Defendant's DNA had been purged after his acquittal, the DNA would have been resubmitted because of the later charges. The trial court found that DNA database saving statute provision in Tennessee Code Annotated section 38-6-113(c)(1) applied and that nothing on behalf of the State was reckless, deliberate, grossly negligent, or repetitive. It further found that neither the Shelbyville Police Department nor the TBI were responsible for Defendant's DNA remaining in the database after acquittal and thus, the good faith exception also applied.

When this Court reviews a trial court's ruling on a motion to suppress evidence, "we uphold the trial court's findings of fact unless the evidence preponderates otherwise." *State v. Washington*, __ S.W.3d __, No. W2022-01201-SC-R11-CD, 2025 WL 2847585, at *6 (Tenn. Oct. 8, 2025) (citations and internal quotation marks omitted); *see also State v. McKinney*, 669 S.W.3d 753, 764 (Tenn. 2023); *State v. Green*, 697 S.W.3d 634, 640 (Tenn. 2024). The party prevailing in the trial court "is entitled to the strongest legitimate view

of the evidence adduced at the suppression hearing[,] as well as all reasonable and legitimate inferences that may be drawn from that evidence." *McKinney*, 669 S.W.3d at 764. We can consider the proof from the suppression hearing and the proof at trial during our evaluation of the correctness of the trial court's ruling on a pretrial motion to suppress. *McKinney*, 669 S.W.3d at 764 (citation and internal quotation marks omitted); *see also Washington*, 2025 WL 2847585, at *3. Nevertheless, despite the deference given to the trial court's findings of fact, we review the trial court's application of the law to the facts de novo with no presumption of correctness. *See Green*, 697 S.W.3d at 640; *Washington*, 2025 WL 2847585, at *3.

Here, Defendant complains that his DNA should not have been in the database because he was acquitted of the crime for which he was required to give a DNA sample. Tennessee Code Annotated section 40-35-321(e)(1) provides: "When a person is arrested on or after January 1, 2008, for the commission of a violent felony as defined in subsection (e)(3), the person shall have a biological specimen taken for the purpose of DNA analysis to determine identification characteristics specific to the person." As relevant to this case, a "violent felony" includes: first degree murder, aggravated assault, attempted aggravated robbery, aggravated burglary, and carjacking. *See* T.C.A. § 40-35-321(e)(3). The Tennessee Supreme Court has addressed the portion of the statute requiring a defendant to contribute DNA and found that it is a reasonable search that does not violate the Fourth Amendment. *State v. Scarborough*, 201 S.W.3d 607, 625 (Tenn. 2006). Additionally, the United States Supreme Court has held that a statute that requires a DNA sample to be taken from a person arrested for a violent felony does not violate the Fourth Amendment. *Maryland v. King*, 569 U.S. 435, 450-56, 465-66 (2013). The State does not get to keep a defendant's DNA in perpetuity, however. The statute provides,

> [i]f the charge for which the sample was taken is dismissed or the defendant is acquitted at trial, then the bureau shall destroy the sample and all records of the sample; provided, that there is no other pending qualifying warrant or capias for an arrest or felony conviction that would otherwise require that the sample remain in the data bank.

T.C.A. § 40-35-321(e)(2). The "clerk of the court in which the charges against [a defendant] are disposed of" is charged with notifying the TBI of the "final disposition" of the criminal proceedings. *Id.* However, "[t]he detention, arrest or conviction of a person based upon a databank match or database information is not invalidated, if it is later determined that the specimens or samples were obtained or placed in the database by mistake." *Id.* § 38-6-113(c)(1).

In this case, Defendant's DNA sample was initially taken after his arrest in 2009 for carjacking; he was ultimately acquitted of attempted aggravated robbery.[4] Both carjacking and attempted aggravated robbery are qualifying felonies under the statute that would have required Defendant to give a DNA sample. However, as noted by both Defendant and the State, Defendant's DNA should have been removed from the CODIS database after he was acquitted. *Id.* § 40-35-321(e)(2). Defendant's DNA sample was not removed. Testimony from the TBI agent at the hearing on the motion to suppress was that there were no records indicating the TBI was ever notified by the local clerk's office that Defendant was acquitted. Defendant was later arrested for aggravated assault, another qualifying violent felony. *Id.* § 40-35-321(e)(3)(C). The record is unclear whether Defendant provided an additional DNA sample when he was arrested for aggravated assault or if there was no sample taken because Defendant's DNA was already in the database. Presumably, even if Defendant's DNA was properly removed after his acquittal, his DNA would have been placed in the database again after his arrest for aggravated assault in 2017, and again after his arrest in September of 2022 for aggravated assault by strangulation and aggravated burglary. The search warrant in this case was not executed until October of 2022, after Defendant's arrests for other qualifying violent felonies.

Defendant argues that the "savings statute" only applies to samples that were "obtained or placed in the database by mistake" and not samples that should have been removed due to dismissals or acquittals. He does not cite any authority to support his assertion. We agree with the State that he is in "peril" of waiving this Court's consideration of the issue. *See* Tenn. Ct. Crim. App. R 10(b). However, we determine that the failure to remove Defendant's DNA from the CODIS database was precisely a situation where the DNA was "placed in the database by mistake" because the TBI never received notice of the acquittal from the circuit court clerk. The fact that his DNA remained in the database does not invalidate his conviction. T.C.A. § 38-6-113(c)(1). In *State v. Scott*, the defendant argued that his DNA was improperly in the database because he was not arrested for a violent felony but rather on a fugitive warrant based on a Mississippi charge for aggravated assault and that his DNA was maintained improperly by the TBI after he was acquitted of the Mississippi aggravated assault. No. W2011-00677-CCA-R3-CD, 2012 WL 1656774, at *1-2 (Tenn. Crim. App. May 10, 2012). A panel of this Court concluded that it was not necessary to determine whether the trial court in that case was correct in finding that the defendant's DNA was properly retained in the CODIS database after the Mississippi acquittal "as he was [already] a convicted felon [in Tennessee and would have been required to give a DNA sample for that reason and] because Tennessee Code Annotated section 38-6-113(c)(1) is clear that any erroneous obtaining or placing [DNA] in the

---

[4] The record is unclear as to whether or how the charge was amended from carjacking to attempted aggravated robbery. However, the record reflects that Defendant was acquitted of attempted aggravated robbery after a trial.

database does not invalidate the defendant's arrest and conviction based on such databank match." *Id.* at \*11.

Similar logic applies here. We determine that the trial court properly denied the motion to suppress based on Tennessee Code Annotated section 38-6-113. The proof at the hearing on the motion to suppress showed that the TBI never received notification of the acquittal and that Defendant was subsequently arrested for violent offenses that would have required him to give a DNA sample. Because the record does not indicate that the TBI improperly retained Defendant's DNA, there is no reason for us to analyze whether the good-faith exception applies. Defendant is not entitled to relief on this issue.

To the extent Defendant argues that his DNA was "fruit of the poisonous tree" and required not only the grant of the motion to suppress but dismissal of the entire indictment, we disagree. Defendant was arrested and charged in September of 2022 for qualifying violent felonies that required a DNA sample by statute. *See* T.C.A. § 40-35-321. There was no violation of the Fourth Amendment. *See Scarborough*, 201 S.W.3d at 625. Defendant is not entitled to relief on this basis.

*Sufficiency*

Defendant argues that there was insufficient evidence to establish that he was the shooter. Specifically, he notes that the only eyewitness described the shooter as White and because he is Black, he could not have been the shooter. Defendant argues that the remainder of the evidence was circumstantial and did not contradict the only eyewitness testimony to the murder. The State argues that "[t]here was no trial testimony that the witness said the shooter was white" and even if there was a conflict in the testimony, the guilty verdict resolves all conflicts in the testimony, and the weight of the evidence is viewed in the light most favorable to the State. In other words, the evidence was sufficient to support the conviction.

When examining whether the evidence presented at trial was sufficient to support a conviction, several well-settled principles guide our analysis. We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled on appeal to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). These principles guide us "'whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was charged here with first degree murder. First degree murder is in relevant part "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Tennessee Code Annotated section 39-13-202(d) (2020) defines premeditation as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The State must prove premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992), *overruled on other grounds by State v. Reynolds*, 635 S.W.3d 893, 917 (Tenn. 2021). The existence of premeditation is a question of fact for the jury and may be inferred from circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Such circumstances may include the use of a deadly weapon on an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, threats or declarations of an intent to kill, a lack of provocation by the victim, failure to aid or assist the victim, the procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v.*

*Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013).

On appeal, Defendant cites to an officer's testimony for the argument that the "sole eyewitness to the shooting specifically said that the shooter was a white male." The record reflects that Sergeant Vest was asked what Mr. Rourke said and counsel for Defendant objected based on hearsay. The trial court opined that the testimony would be hearsay if the statement was being offered for the truth of the matter asserted, but if the State wanted to ask the officer whether he received a description from Mr. Rourke and what his response was to receiving that description, it would not be hearsay. The State then asked the officer what description he received and the officer replied that the shooting involved two white males, one of whom was deceased, and that the shooter was wearing a straw hat and a bandana on his face. The trial court instructed the jury that the testimony could "be used . . . for a description of the individuals who he may be looking for" but not for the truth of the matter asserted, i.e. that the shooter was actually white. When Mr. Rourke testified at trial, he did not provide the skin color of the shooter. Even if he had, the testimony would have merely created a conflict, and the jury's verdict resolves all conflicts in the testimony in favor of the State. *Harris*, 839 S.W.2d at 75.

Here, the evidence was sufficient to support the verdict. The testimony revealed that the shooter was wearing a straw hat. A straw hat was found at the scene. Defendant's DNA was a major contributor of the DNA found on the hat. Defendant's work truck contained a GPS monitor. There was no testimony that the truck was out of Defendant's control during the time of the murder. The truck's GPS indicated that the truck traveled from Defendant's home to the scene of the murder and back at the time the murder was committed. Surveillance video from multiple businesses showed Defendant's truck in Shelbyville on the night of the murder. The victim was shot multiple times. The victim's former employer transferred $2000 to Defendant's account. Any rational trier of fact could have found beyond a reasonable doubt that Defendant murdered the victim. The evidence was sufficient to support the verdict. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

S/Timothy L. Easter
_____
TIMOTHY L. EASTER, JUDGE

- 12 -